# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
CAROL SMITH, Individually and as )
Personal Representative of the )
Estate of Erika Smith, )
 )
   Plaintiff, )
 )
  v. )  Civil Action No. 05-633 (RBW)
 )
HOPE VILLAGE, INC., )
 )
   Defendant. )
 )
———————————————————————— )

## MEMORANDUM OPINION

Plaintiff Carol Smith brings this action against Hope Village, Inc. ("the defendant" or

"Hope Village"), a privately-operated facility that "provide[s] halfway house services to

offenders in the District of Columbia," for compensatory and punitive damages arising from the

murder of her daughter, Erika Smith, by Anthony Kelly, a convicted felon and former Hope

Village resident.  Complaint ("Compl.") ¶ 7.  On July 26, 2006, the Court granted the

defendant's motion for judgment on the pleadings as to Count II of the complaint, the plaintiff's

wrongful death claim, pursuant to Federal Rule of Procedure 12(c).  Order at 6.  Currently before

the Court is the defendant's motion ("Def.'s Mot.")[1] for judgment on the pleadings, or in the

---

[1] The following papers have been submitted in connection with this motion: (1) Memorandum of Points and Authorities in Support of Defendant's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment ("Def.'s Mem."); (2) Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant Hope Village's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment ("Pl.'s Opp."); (3) Defendant's Reply in Support of the Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment ("Def.'s Reply"); (4) Statement of Material Undisputed Facts in Support of Defendant's Motion
(continued...)

alternative for summary judgment, on the plaintiff's remaining claim, a survival action filed on

behalf of her daughter's estate.  Def.'s Mot. at 1.  Also before the Court is the plaintiff's motion

("Pl.'s Mot.") to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e),

which asks the Court to reconsider its July 26, 2006 Order dismissing the plaintiff's wrongful

death claim.  Pl.'s Mot. at 1.  For the reasons set forth below, the Court denies the defendant's

motion for judgment on the pleadings or in the alternative for summary judgment and grants the

plaintiff's motion to alter or amend judgment.

## I. Background

The plaintiff alleges the following facts in support of her complaint.[2]  In August 1996,

Anthony Quentin Kelly was convicted "for pointing a loaded gun at the head of a woman,

---

[1](...continued)
for Judgment on the Pleadings or in the Alternative for Summary Judgment ("Def.'s Stmt."); and (5) Plaintiff's
Statement of Material Facts as to Which There is a Genuine Issue and Response to Defendant's Statement of
Material Undisputed Facts in Support of its Motion for Summary Judgment ("Pl.'s Stmt.").

In June and July 2006, the defendant also filed a motion for a protective order pursuant to Federal Rule of
Civil Procedure 26(c) and a motion to quash subpoenas pursuant to Federal Rule of Civil Procedure 45, both relating
to the plaintiff's requests for, inter alia, the defendant's financial information and telephone records.  In her
November 2006 opposition to the defendant's motion for judgment on the pleadings or for summary judgment, the
plaintiff states that "after more than one year of discovery, the parties have agreed to complete discovery by January
15, 2007. . . . [A]s of that date, and upon resolution of the instant motion and [the] [p]laintiff's pending motion to
reconsider, this matter will be ripe to proceed to trial."  Pl.'s Opp. at 20 n.22.  It therefore appears that the plaintiff is
no longer seeking to discover the disputed information.  Accordingly, in the interests of judicial efficiency, the Court
will deny without prejudice the defendant's motions for a protective order and to quash the plaintiff's subpoenas.
The defendant may move to reinstate these motions if necessary.

Finally, the defendant moves for a stay of discovery pending resolution of its motion for judgment on the
pleadings or for summary judgment.  Def.'s Mem. at 13-16.  As noted above, it now appears that the parties have
completed all discovery.  The Court will therefore deny without prejudice the defendant's motion to stay as being
moot.

[2] In considering the defendant's motion for judgment on the pleadings pursuant to Rule 12(c), the Court
must "view the complaint's allegations in the light most favorable to the plaintiff."  Thompson v. District of
Columbia, 428 F.3d 283, 284 (D.C. Cir. 2005).  Moreover, "[i]n deciding whether there is a genuine issue of
material fact [precluding a grant of summary judgment pursuant to Rule 56(c)], the [C]ourt must assume the truth of
all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record."
Dist. Intown Props. Ltd. P'ship v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (citation omitted).  The
plaintiff's allegations are undisputed except where noted by the Court.

threatening to kill her and her husband, and driving a stolen car," Pl.'s Opp. at 4; see also Compl.

¶ 8; Pl.'s Opp., Exhibit ("Ex.") 3 (Presentence Report for Anthony Kelly) ("Presentence Report")

at 2, and sentenced to a ten year and six month term of incarceration in federal prison, Pl.'s Opp.

at 4.  Kelly is a repeat offender with a long and checkered criminal history, including an arrest for

escaping from a halfway house, an indictment for making felony threats, and multiple prior

convictions for, inter alia, burglary and the unauthorized use of a motor vehicle.[3]  Pl.'s Opp. at 5;

see also Presentence Report at 3-6 (detailing Kelly's criminal record); Pl.'s Opp., Ex. 8 (January

28, 2003 memorandum from Assistant United States Attorney Michael Britton to attorney John

McCarthy) ("Britton Memo") at 2-3 (summarizing Kelly's criminal record and stating that "[h]e

has been convicted of thirteen crimes[,] eleven felonies and two misdemeanors[,] . . . which stem

from six separate criminal cases"); Pl.'s Opp., Ex. 9 (Affidavit of Dr. Mario Paparozzi, Ph.D)

("Paparozzi Aff.") ¶ 50 (stating that "[t]he record shows that Anthony Kelly was a known violent

criminal offender who frequently engaged in theft, burglaries, and other property crimes, as well

as violent crime, including with a loaded gun"); Pl.'s Opp., Ex. 25 (June 27, 2001 decision of

United States Parole Commission) ("Parole Decision") at 1 (noting Kelly's prior convictions).[4]

On December 12, 2001, after serving approximately five years of his sentence, Kelly was

transferred from prison to Hope Village, a halfway house located in the District of Columbia.

Compl. ¶ 9; Def.'s Mem. at 3; Pl.'s Opp. at 4.

---

[3] The defendant does not dispute, nor even address, the evidence submitted to support the plaintiff's representations regarding Kelly's criminal history.  See generally Def.'s Mem.; Def.'s Reply; Def.'s Stmt.

[4] The plaintiff presents Dr. Paparozzi as "a recognized expert in the field of community corrections."  Pl.'s Opp. at 5 n.4; see also Paparozzi Aff. ¶¶ 2-13 (detailing Dr. Paparozzi's extensive experience and training relating to community correctional programs).  The defendant does not challenge Dr. Paparozzi's qualifications as an expert, nor does it offer any contrary affidavits, expert testimony, or factual evidence to rebut the sworn statement provided by Dr. Paparozzi.  See generally Def.'s Mem.; Def.'s Reply; Def.'s Stmt.

Hope Village is a private facility that contracts with the Federal Bureau of Prisons ("BOP"), among other entities, to provide transitional services and housing to various correctional populations, including felons such as Kelly who have been convicted of violent crimes.  Compl. ¶¶ 7, 10; <u>see also</u> Pl.'s Opp. at 4 (stating that "[Hope Village] is a private, for-profit, community-based correctional facility . . . responsible for supervising criminal offenders while it was determined whether they would be released on parole"); Paparozzi Aff. ¶ 16 (stating that "halfway houses are required to provide correctional and paroling authorities with the information necessary to make determinations regarding release or reincarceration by closely watching and reporting how inmates adjust as the restraints and degree of supervision of prison confinement are lessened").  According to the plaintiff, "[t]he purpose of programs like [Hope Village] [is] to provide an opportunity for offenders to demonstrate, while under constant scrutiny, that they might safely be returned to the community . . . without reasonable fear for the safety of local citizens."  Pl.'s Opp. at 9; <u>see also</u> Pl.'s Opp., Ex. 6 (BOP January 2000 Comprehensive Sanctions Center Statement of Work) ("SOW") at 0 (stating that "[t]he mission of [facilities such as Hope Village] is to protect society by confining offenders in the controlled environments of . . . community-based facilities that are safe, humane, cost-efficient[,] and appropriately secure, [while] provid[ing] work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens"); Paparozzi Aff. ¶ 16 (stating that "[t]he primary mission of . . . private correctional organizations[] like Hope Village . . . is to ensure public safety while safely transitioning inmates from incarceration back to their communities, or returning inmates to prison when they are not fit for community release").  In order to accomplish these goals, halfway houses such as Hope Village are required, upon the admission of each

resident, to "review available documents[] [such as] Judgment/Commitment Order[s] from the sentencing [c]ourt[s], criminal records, [and] presentence investigation reports[] for any indication that an offender has a history of . . . violent or escape behavior."  SOW at 36; see also Pl.'s Opp. at 8; Paparozzi Aff. ¶ 26 (stating that halfway houses must "take into account the specific history and characteristics of each individual inmate in order to provide adequate supervision and monitoring, and to protect the community from foreseeable conduct").  While at Hope Village, Kelly remained an inmate under the care and custody, if not the direct supervision, of the BOP.  Paparozzi Aff. ¶ 19 (stating that "Anthony Kelly was an inmate under the care and custody of the [BOP] when he was serving his sentence at Hope Village"); see also SOW at 0 (stating that facilities such as Hope Village "provide[] comprehensive community-based services for offenders . . . who are in the custody of the BOP, United States Attorney General, or under the supervision of the United States Probation Office"); Paparozzi Aff. ¶ 17 (stating that "[i]nmates placed in halfway houses are still under the custody of the prison system governing the jurisdiction of their sentence").

Kelly resided at Hope Village from December 2001 until March 2002.  Def.'s Mem. at 3; Pl.'s Opp. at 5.  During this four-month period, the plaintiff alleges (1) that Hope Village was negligent in its supervision of Kelly, "failing to review or take into account [his] history of violence and escape," Pl.'s Opp. at 8, and overlooking or disregarding his numerous violations of the conditions of his confinement there; and (2) that through this negligence and inaction, Hope Village was ultimately responsible for Kelly's improper and untimely release into the community, where he was free to commit violent criminal acts.  Id. at 5-19; Compl. ¶¶ 10-12. Specifically, the plaintiff alleges that during Kelly's tenure at Hope Village, he "openly violated

the terms of his conditional release to [Hope Village] by failing to secure employment as required, submitting to [Hope Village] facially false (and inadequate) documentation to facilitate his release to the community, and spending his days of 'confinement' roaming the community freely, committing acts of crime."  Pl.'s Opp. at 5;  see also Compl. ¶¶ 10-12.  The plaintiff asserts that although these violations were known or should reasonably have been known by Hope Village, the facility "never disciplined Kelly, never reported his actions to the appropriate federal agencies, and never recommended his return to federal custody for violating the conditions of his release to the halfway house."  Pl.'s Opp. at 6 (emphases omitted);  see id. at 8 (alleging that Hope Village "failed to review or take account of Kelly's history of violence and escape . . . [or] report to the government significant verifiable facts regarding Kelly's noncompliance with employment and payment obligations");  see also Paparozzi Aff. ¶ 19 (opining that "had Hope Village reported Kelly's violations [to the BOP] when they occurred . . . Kelly would have been returned to prison and his parole date rescinded").  The plaintiff also contends that Hope Village negligently contributed to Kelly's parole when it, inter alia, "knowingly submitted erroneous documentation to the government that Kelly had met all conditions for release . . . execut[ed] the documentation which permitted Kelly to be released[,] . . . [and] recommend[ed] to federal authorities that Kelly be released to the community."  Pl.'s Opp. at 6.  Finally, the plaintiff alleges that Hope Village failed, in a manner that amounts to massive and large-scale institutional indifference and incompetence, to provide basic levels of facility security and resident oversight or to otherwise "exercise reasonable care to ensure that its residents did not, as a result of [Hope Village's] own action or inaction, cause harm to innocent

members of the community."[5]  Id. at 7; see also id. at 7-17 (describing numerous and endemic

failures to properly supervise residents), 18 (alleging that "[Hope Village's] failures . . . pervaded

every aspect of the company's operation, from its hiring and staffing decisions to its monitoring

protocols to its reporting functions").  Significantly, the defendant does not attempt to rebut, nor

does it even address, any of the plaintiff's allegations regarding either (1) the failure of Hope

Village to properly supervise Kelly or report his repeated violations of the conditions of his

release; (2) the role of Hope Village in improperly recommending and facilitating Kelly's release

into the community; or (3) the general inability of Hope Village "to abide by comprehensive

rules and requirements designed to ensure the accountability of [Hope Village] and its residents[]

and the protection of the outside community," Pl.'s Opp. at 7, including the pervasive inadequacy

of facility security, daily monitoring and supervision of residents, and staffing levels and training.

See generally Def.'s Mem.; Def.'s Reply; see also Def.'s Mem. at 3 (contending that "[t]he

matters at issue in this [m]otion are purely legal"); Def.'s Reply at 1 (identifying as the central

issue of the case whether "a halfway house owe[s] a duty to unknown parties with whom it has

no relationship for harm caused by an offender previously housed at the halfway [house]

approximately [five months] prior to the offender's harmful act").

        One example of Hope Village's alleged failure to properly supervise Kelly is particularly

instructive.  Hope Village residents are required to secure full-time, gainful employment during

---

[5]  For example, the plaintiff alleges that Hope Village systematically failed to adhere to "requirements regarding monitoring of visitors, regular searches and removal of contraband (including car keys), video and physical monitoring of all building entrances, immediate notification to the government of any conduct subject to criminal prosecution, . . . and termination for driving without permission."  Pl.'s Opp. at 10; see also id. at 18 (alleging that "[s]taff members and management specifically responsible for Kelly were underequipped and underqualified to do their jobs properly and failed to take the necessary measures to ensure that Kelly followed the rules or was reported to the authorities when he broke them").

their time at the facility, subject to ongoing verification by Hope Village staff, as part of their

transition back into the community.[6]  Pl.'s Opp., Ex. 7 (Hope Village Policies and Procedures

Manual) ("PPM") at 74; see also SOW at 43-44.  Among other conditions related to this

requirement, residents (1) may not be employed by family members; (2) must always be available

by phone at their work site; (3) must account for all hours spent at work; and (4) must remain at

Hope Village to see their employment counselor on any day on which they are not actively

employed.  PPM at 74-77.  Furthermore, Hope Village policy states that "[i]f the resident's work

day is cut short . . . , they must return immediately to the facility."  Id. at 76.  Failure to comply

with any of these conditions should result in the creation of an incident report and a possible

recommendation to the BOP that the resident's parole status be rescinded and that he be

reincarcerated.  See PPM at 77 (stating that if Hope Village discovers that a resident has violated

the terms of his employment, "an incident report must be immediately initiated"); see also id. at

74, 76;  Pl.'s Opp. at 16.  In addition, any resident who "fails to remain at [his] approved place of

employment . . . during the hours specified by the terms of their employment" is considered to be

on "escape."  SOW at 94; see also PPM at 125 (stating that "[a]n escape is defined as any

unauthorized absence from a program assignment without a verifiable or justifiable reason").  In

the event of an escape, Hope Village is required to "immediately notify" the BOP if the escaped

resident is not located within twenty minutes.  SOW at 95.  Hope Village must also "prepare an

incident report and conduct a disciplinary hearing in the [escapee's] absence."  Id.  Residents

who have been placed on "escape" status are also documented in a written incident report and are

---

[6] Any employment totalling less than forty hours per week must be approved by Hope Village.  Pl.'s Opp.,
Ex. 7 (Hope Village Policies and Procedures Manual) ("PPM") at 74.  Kelly neither sought nor received approval to
work less than full-time.  Pl.'s Opp. at 16.

subsequently subject to reincarceration.  Id. at 94-95; see also Pl.'s Opp., Ex. 5 (Deposition of

Joseph Wilmer) ("Wilmer Dep.") at 111-12 (stating that if a resident "signed out for 40 hours . . .

and [gets] paid for 32, something's wrong because [he's] missing for 8 hours. . . .  [T]hat's an

escape[, and if the resident has no legitimate explanation for the discrepancy, he would] be

written up for an escape, [there would be a] recommendation of termination, and then [the case]

goes to the [BOP] to see what they're going to do").[7]

        Kelly supposedly secured a full-time landscaping position in January 2002, shortly after

he arrived at Hope Village.  Pl.'s Opp. at 13.  However, the plaintiff alleges, and the defendant

does not dispute, that Kelly failed to comply with the terms of his employment in a number of

ways.  Pl.'s Opp. at 10-17.  First, the plaintiff contends that Kelly's purported employer was his

stepfather, an arrangement forbidden by Hope Village policies.  Id. at 13, 16; see also Pl.'s Stmt.

at 7 (alleging that "[Hope Village] staff failed to make any inquiry regarding the relationship

between Kelly and his purported employer").  Second, the plaintiff claims that the

"documentation provided by Kelly to prove his employment was facially inadequate," Pl.'s Stmt.

at 7, and reflected only thirty-two hours of work during Kelly's entire time at Hope Village, Pl.'s

Opp. at 16; Wilmer Dep. at 250-56 (examining Kelly's pay stub, which reflected four days of

eight-hour employment over a two-week period).  Under the relevant regulations, this

discrepancy alone was, or should have been, sufficient to put Hope Village on notice that Kelly

was not working his full allotment of hours and that he should be considered to be on "escape"

status.  SOW at 94-95; see also Pl.'s Opp. at 16 (stating that "the pay stubs and subsistence

---

[7] Joseph Wilmer is Hope Village's corporate designee pursuant to Federal Rule of Civil Procedure 30(b)(6).  Pl.'s Opp. at 5.

receipts[] in Kelly's file . . . were so inadequate as to have required further inquiry and ultimate

recommendation that Kelly be terminated from the program for escape") (citation omitted).

Third, the plaintiff alleges that in actuality, "Kelly did not work a single day [while at Hope

Village]," but rather "left [the facility] each morning, went around the corner, got into a stolen

car, and drove around the community until he returned each evening." Pl.'s Opp. at 13-14.

Nevertheless, at no point "[d]uring his tenure [at Hope Village] . . . [did Kelly] incur any incident

reports." Pl.'s Opp., Ex. 10 (March 8, 2002 Final Progress Report) ("Final Progress Report") at

2. Indeed, the plaintiff contends that Hope Village (1) did not properly verify Kelly's

employment; (2) failed to continue to monitor Kelly's employment situation through on-site

visits, telephone calls, and other means of contact; and (3) never "attempted to confirm that Kelly

was <u>still</u> working when . . . recommend[ing] his release to the community." Pl.'s Opp. at 15

(emphasis added); <u>see id.</u> at 12-17 (detailing deficiencies); Pl.'s Stmt. at 6 (alleging that "Hope

Village failed to verify Anthony Kelly's employment consistent with the Statement of Work or

the standard of care for community-based correctional facilities"). The plaintiff further asserts

that had Hope Village monitored Kelly's employment situation in a manner consistent with its

own stated policies and procedures, "Kelly's violations would have been detected and he would

not have been released, but rather returned to prison." Pl.'s Opp. at 15; <u>see also</u> Pl.'s Opp., Ex.

16 (Deposition of Coretta Nichelle Brown-Speight) ("Brown Speight Dep.") ¶ 16 (stating that

Hope Village residents "who said they were working but who were found not to be working . . .

[were] always sent back to jail");[8] Paparozzi Aff. ¶ 46 (opining that "the paroling authority would

---

[8] Ms. Brown-Speight formerly held the position of "Charge of Quarters" at Hope Village and was employed at the facility while Kelly was a resident there. Brown-Speight Dep. ¶ 2.

10

have rescinded Kelly's parole date based on these violations[,] and . . . Kelly [likely] would not have been eligible to be released into the community for 12 to 18 months").  Instead, Hope Village "issued a favorable report for Kelly and took the final steps necessary to facilitate his release by the government."  Id.; see also Pl.'s Opp., Ex. 10 (March 8, 2002 Final Progress Report) ("Final Progress Report") at 1-2 (stating that Kelly "[m]aintained [his] employment [at his landscaping job] until his departure" and finding that "[h]is prognosis for the future is favorable"); Pl.'s Opp., Ex. 11 (March 4, 2002 Request for Parole Certificate by Hope Village for Anhony Kelly) at 1; Pl.'s Opp., Ex. 12 (February 6, 2002 Release Plan from Hope Village to Community Supervision Officer Jerry Doh) ("Release Plan") at 1 (stating that Kelly's "[e]mployment [p]attern . . . [is] [s]table").

On March 7, 2002, Kelly was discharged from Hope Village and released into the community, where he was placed under the supervision of the Court Services and Offender Supervision Agency ("CSOSA").[9]  Def.'s Stmt. ¶ 5; Pl.'s Stmt. at 3; see also Paparozzi Aff. ¶ 48.  It is undisputed that the level of scrutiny with which an offender is supervised following his release on full parole is more relaxed and less restrictive than the conditions of his confinement as a halfway house resident.  Pl.'s Opp. at 38; see Paparozzi Aff. ¶ 21 (remarking upon the "more liberal monitoring" of offenders by the CSOSA relative to a halfway house).  Following Kelly's discharge, he allegedly embarked on a crime spree including "several auto thefts throughout the [District of Columbia metropolitan] area, the burglary of a gun store in Montgomery County[,]

---

[9]  The parties also agree that the BOP and the United States Parole Commission played some role in the supervision of Kelly following his release into the community.  Def.'s Stmt. ¶ 5; Pl.'s Stmt. at 3.  However, for the sake of convenience, and because the CSOSA apparently had the greatest amount of direct supervisory authority over Kelly of the three agencies, see Paparozzi Aff. ¶ 48, the Court will refer only to the CSOSA when discussing Kelly's post-release supervision.  Such reference, however, is not intended to suggest that the CSOSA had sole supervisory authority over Kelly during this period.

[Maryland], armed robberies in Takoma Park[,] [Maryland], sex assaults in Montgomery County[,] . . . and the murder of a tourist in Washington[,] D.C." Pl.'s Opp., Ex. 13 (July 20, 2006 Affidavit of Detective Michael Brent) ("First Brent Aff.") ¶ 3; see also id. ¶¶ 4-18.  The parties do not dispute that the CSOSA "improperly supervised Anthony Kelly after his discharge from [Hope Village]."  Pl.'s Stmt. at 4; see also Def.'s Stmt. ¶ 7.  According to the plaintiff, the CSOSA did not "take[] the necessary measures to detect Kelly's violations and reincarcerate him, and [did not] supervise[] Kelly as it would an individual who was likely to commit additional serious crime."[10]  Pl.'s Stmt. at 6; see also Def.'s Mem. at 11 (discussing the plaintiff's claims that the CSOSA negligently supervised Kelly after his release from Hope Village); Def.'s Reply at 10 (same).

On the night of August 6, 2002, five months after his release, Kelly broke into the house of Gregory Russell in Silver Spring, Maryland, armed with a .32 caliber revolver.[11]  Compl. ¶ 14;

_____

[10]  The plaintiff claims that this negligence is attributable to the CSOSA's reliance on "incorrect and incomplete information provided by [Hope Village] regarding the activities, behavior, violations, and risk assessment of Anthony Kelly while he was at [Hope Village], which directly impacted any subsequent supervision by [the CSOSA] after [Kelly] was discharged."  Pl.'s Stmt. at 4.

[11]  The defendant denies that this burglary (and the subsequent murders of Gregory Russell and the plaintiff's daughter, Erika Smith) were committed by Kelly, claiming instead that "[the] [p]laintiff's daughter was murdered by several intruders" and that "[t]o this day, no one has ever been convicted of the murder[s]."  Def.'s Mem. at 4.  As the plaintiff amply details, however, "all of the evidence demonstrates that Kelly is the only person suspected of committing Erika's murder[,] and . . . his guilt is corroborated by substantial evidence (including DNA evidence) gathered by investigators in the case."  Pl.'s Opp. at 19 n.20 (citing Pl.'s Opp., Ex. 13 (July 20, 2006 Affidavit of Detective Michael Brent) ("First Brent Aff."); Pl.'s Opp., Ex. 14 (October 19, 2006 Affidavit of Detective Michael Brent) ("Second Brent Aff."); Second Brent Aff., Ex. A (Summary of Anthony Kelly's Involvement in the Russell/Smith Murder Investigation) ("Investigation Summary")).  In addition, the defendant's statement that "no one has ever been convicted of the murder[s]," Def.'s Mem. at 4, is an obvious red herring.  The defendant offers nothing to contradict the plaintiff's contention that "Kelly was indicted for Erika's murder and remains in the custody of the State of Maryland but was declared incompetent and unable to stand trial."  Pl.'s Opp. at 19 n. 20 (citing Pl.'s Opp., Ex. 32 (May 15, 2003 Indictment of Anthony Kelly); Pl.'s Opp., Ex. 33 (May 27, 2004 Montgomery County Circuit Court Competency Order).  Accordingly, the Court will treat as true the plaintiff's allegation that Kelly is solely responsible for the murder of the plaintiff's daughter, despite the fact that he has not been convicted of the offense.

see also First Brent Aff. ¶ 1; Pl.'s Opp., Ex. 14 (October 19, 2006 Affidavit of Detective Michael

Brent) ("Second Brent Aff."), Ex. A (Summary of Anthony Kelly's Involvement in the

Russell/Smith Murder Investigation) ("Investigation Summary") at 1-2.  Erika Smith, the

plaintiff's nine-year-old daughter, was present in the house with Russell, her natural father.  Id.

Kelly shot Erika Smith once at point-blank range and shot Russell eight times, killing them both.

Id.  After a multiple-state manhunt, Kelly was captured by authorities in College Park, Maryland,

on September 5, 2002.  Compl. ¶ 15; see generally Investigation Summary.  He was then indicted

in Montgomery County Circuit Court on May 15, 2003, Compl. ¶ 15, and charged with the

murders of Smith and Russell, as well as various other crimes including "two rapes, burglary,

and armed robbery," First Brent Aff. ¶ 19.[12]

The plaintiff brought this wrongful death and survival action against Hope Village on

March 28, 2005, alleging that the facility had, "by virtue of its negligent acts and/or omissions,

directly and proximately caused the premature and wrongful death of Erika Smith . . . [by]

prematurely and negligently releas[ing] [Kelly] from its custody." Compl. ¶¶ 1-2.  The plaintiff

seeks compensatory damages as well as "[p]unitive damages . . . for [the] [d]efendant's

conscious, willful, wanton, and reckless disregard for the rights of innocent members of the

community."  Id. ¶¶ 25-26.  On July 26, 2006, the Court granted the defendant's motion for

judgment on the pleadings as to the plaintiff's wrongful death claim, concluding that the claim

was "time-barred by the statute of limitations contained in . . . the District of Columbia's

wrongful death statute."  Order at 2 (citing D.C. Code § 16-2702 (2001)).  The defendant has

---

[12]  Kelly has also been indicted in the District of Columbia for the August 2002 gunshot murder of a Seattle
tourist.  First Brent Aff. ¶ 19; see also Investigation Summary at 4-5.

now moved for judgment on the pleadings or, in the alternative, for summary judgment on the

plaintiff's remaining claim, arguing that (1) it did not owe any legal duty to the plaintiff for

injuries resulting from the criminal act of a third party, Def.'s Mem. at 6-8; (2) the murder of the

plaintiff's daughter was not a reasonably foreseeable consequence of Hope Village's allegedly

negligent conduct, id. at 8-10; (3) the plaintiff's asserted injury was too remote in time and space,

and too unrelated to the defendant's conduct, to be proximately caused by Hope Village's alleged

negligence, id. at 12; and (4) any duty that Hope Village might have had to protect the

community from harm done by Kelly was extinguished upon Kelly's March 2002 discharge from

the facility and subsequently superseded by the intervening negligence of the CSOSA and by

Kelly's own criminal acts, id. at 10-12.  In turn, the plaintiff moved for reconsideration of the

Court's July 26, 2006 order, contending that the Maryland statute of limitations properly

governed the time limit for filing her wrongful death claim.  Pl.'s Mot. at 1-2.  For the reasons

that follow, the Court denies the defendant's motion for judgment on the pleadings or for

summary judgment and grants the plaintiff's motion for reinstatement of her wrongful death

claim.

## II. Standards of Review

### A.  Motions for Judgment on the Pleadings

Courts will grant judgment on the pleadings pursuant to Federal Rule of Civil Procedure

12(c) "only if it is clear that no relief could be granted under any set of facts that could be proved

consistent with the allegations." Longwood Village Rest., Ltd. v. Ashcroft, 157 F. Supp. 2d 61,

66 (D.D.C. 2001) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Fed. R.

Civ. P. 12(c).  "[I]f there are allegations in the complaint which, if proved, would provide a basis

14

for recovery[,]" the Court cannot grant judgment on the pleadings.  Bradley v. Smith, 235 F.R.D. 125, 126 (D.D.C. 2006) (internal quotation marks and citation omitted).  "[A]ll factual doubts [must therefore be] resolved in favor of the plaintiff[]."  Chang v. United States, 338 F. Supp. 2d 20, 21 (D.D.C. 2004) (citation omitted).  The standard of review under Rule 12(c) is thus essentially the same as that for a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Plain v. AT&T Corp., 424 F. Supp. 2d 11, 20 n.11 (D.D.C. 2006).

## B.  Motions for Summary Judgment

Courts will grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or denials." Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (quotation marks omitted).  Thus, "conclusory allegations unsupported by factual data will not create a triable issue of fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted).   If the Court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the moving party is entitled to

summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Thus, in a negligence

action, the defendant is entitled to summary judgment only if, after viewing the evidence in the

light most favorable to the plaintiff, "no reasonable jury could find that [the plaintiff] established

each of the elements of negligence." Briggs v. Wash. Metro. Area Transit Auth., ___ F.3d ____,

____, No. 06-7037, slip op. at 6 (D.C. Cir. Mar. 27, 2007) (citation omitted).

### C.  Motions to Alter or Amend Judgment

A motion to alter or amend judgment pursuant to Rule 59(e) is subject to the Court's

discretion and "need not be granted unless the [Court] finds that there is an intervening change of

controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." Messina v. Krakower, 439 F.3d 755, 758 (D.C. Cir. 2006) (internal

quotation marks and citation omitted).  "[A] Rule 59(e) motion to reconsider is not simply an

opportunity to reargue facts and theories upon which a court has already ruled, nor is it a vehicle

for presenting theories or arguments that could have been advanced earlier." Fresh Kist Produce,

LLC v. Choi Corp., 251 F. Supp. 2d 138, 140 (D.D.C. 2003) (internal quotation marks and

citations omitted); see also Messina, 439 F.3d at 759 (stating that Rule 59(e) motions may not

simply "rely on the same arguments . . . originally made" by the moving party) (internal

quotation marks and citation omitted).  "While the [C]ourt has considerable discretion in ruling

on a Rule 59(e) motion, the reconsideration and amendment of a previous order is an

extraordinary measure." Fresh Kist Produce, 251 F. Supp. 2d. at 140 (citing Firestone v.

Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam)); see also Jung v. Ass'n of Am.

Med. Colls., 184 Fed. Appx. 9, 13 (D.C. Cir. 2006) (noting "the high standard for relief under

Rule 59(e)").

16

**III. The Defendant's Motion for Judgment on the Pleadings or for Summary Judgment**

Hope Village contends that it is not responsible for the death of the plaintiff's daughter as a matter of law.  Def.'s Mot. at 1.  Specifically, it argues that it cannot "be held liable for the alleged, unforeseeable criminal act of a third party that occurred . . . five months after the third party at issue (1) left [the] [d]efendant's facility, custody, and supervision, and (2) was placed under the sole supervision of government agencies who are not parties to this lawsuit."  Def.'s Mem. at 3 (emphasis omitted).  The defendant further states that the plaintiff's theory of liability "reshape[s] the law of causation and create[s] massive, expanded liability for alleged tortfeasors where neither duty nor causation exist."  Def.'s Mot. at 1.  In response, the plaintiff asserts that "[m]yriad state and federal cases, in the District of Columbia and other jurisdictions, have found both the existence of a duty[] and liability[] on facts similar to those at issue here," and that the defendant has failed to demonstrate that it is entitled to either judgment on the pleadings or summary judgment with respect to the plaintiff's action.  Pl.'s Opp. at 1-2.  Moreover, she claims that "[a]ccording to [the defendant], no halfway house ever could be held liable for the consequences of its own negligence, reckless conduct, or deliberate indifference once an offender is released on parole and walks out its doors."  Id. at 1 (emphasis in original).  As discussed below, the Court agrees with the plaintiff.

Where, as here, diversity of citizenship is the jurisdictional basis for a case being brought in federal court, "the substantive tort law of the District of Columbia controls."[13]  Novak v.

---

[13]  Additionally, as discussed below, to the extent that the plaintiff's wrongful death claim is properly brought under the substantive law of Maryland rather than the District of Columbia, identical tort principles apply. See Part IV, infra; see also n.15, infra.  Where appropriate throughout this Memorandum Opinion, the Court will support its conclusions with parallel citations to applicable Maryland law.

17

Capital Mgmt. and Dev. Corp., 452 F.3d 902, 907 (D.C. Cir. 2006) (internal quotation marks and citation omitted).  "[T]o establish negligence [in the District of Columbia,] a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach."  Id. (internal quotation marks and citation omitted); see also District of Columbia v. Beretta U.S.A., Corp., 872 A.2d 633, 641 n.3 (D.C. 2005) (en banc) (same); Lloyd v. General Motors Co., 916 A.2d 257, 270-71 (Md. 2007) (same).  The defendant challenges the first and third elements of this framework: whether Hope Village owed a duty of care to the plaintiff, and whether its allegedly negligent conduct was the proximate cause of the plaintiff's injury, i.e., the murder of her nine-year-old daughter.[14]  Def.'s Mem. at 6-12.  "The existence of . . . a legal duty owed by the defendant to the plaintiff[] is a question of law, to be determined by the [C]ourt."  In re Sealed Case, 67 F.3d 965, 968 (D.C. Cir. 1995) (citations omitted); Doe v. Pharmacia & Upjohn Co., 879 A.2d 1088, 1092 (Md. 2005) (same).  By contrast, "[i]n most cases, the existence of proximate cause is a question of fact for the jury," McNeal v. Hi-Lo Powered Scaffolding, Inc., 836 F.2d 637, 644 (D.C. Cir. 1988) (internal quotation marks and citation omitted), and "only if it is absolutely clear that the [defendant's] negligence could not have been a proximate cause [of the harm asserted by the plaintiff] is it a question of law," Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (internal

---

[14]  The defendant also contests its liability on the grounds that (1) the plaintiff's injury was not a reasonably foreseeable consequence of Hope Village's alleged negligence, Def.'s Mem. at 8-10; (2) Hope Village's purported duty to protect others from Kelly was extinguished when he was released from the halfway house and placed under the supervision of the CSOSA, id. at 7-8; (3) both the CSOSA's allegedly negligent supervision of Kelly following his release and Kelly's criminal actions themselves are superseding causes which serve to shield Hope Village from liability, id. at 10-12; and (4) the plaintiff's injury was too remote and unrelated in time and space to the defendant's allegedly negligent conduct to support a cause of action against the defendant, id. at 12.  All of these questions are addressed below in the context of the Court's examination of the prongs of the applicable test relating to duty and proximate cause.

quotation marks and citation omitted); see also Exxon Co. v. Sofec, Inc., 517 U.S. 830, 840-41

(1996) (holding that "[t]he issues of proximate causation and superseding cause involve

application of law to fact, which is left to the factfinder") (citation omitted); Smith v. District of

Columbia, 413 F.3d 86, 102 (D.C. Cir. 2005) (observing that "the proximate cause of an injury is

ordinarily a question for the jury") (internal quotation marks and citation omitted); Sanders v.

Wright, 642 A.2d 847, 849 (D.C. 1994) (stating that "[t]he question becomes one of law . . .

when the evidence [that would be] adduced at trial will not support a rational finding of

proximate cause") (internal quotation marks and citation omitted).  The Court will examine the

parties' arguments regarding duty and proximate causation in turn.

 **A.  Duty and Foreseeability**

   *1. Does Hope Village Owe a Duty of Care to the Community?*

 Hope Village argues that it does not owe any legally cognizable duty to the plaintiff, or to

any parties with whom it has no pre-existing relationship, for injuries resulting from Kelly's

criminal conduct.  Def.'s Mem. at 6-8.  It further contends that the plaintiff cannot make the

heightened showing necessary in this jurisdiction to demonstrate that the criminal acts of a third

party were sufficiently foreseeable by Hope Village such that a duty arose to guard specifically

against them.  Id. at 6, 8-10.  The Court disagrees.

 In the District of Columbia, as in many other jurisdictions, courts "ha[ve] been reluctant

to see a defendant held liable for harm caused by the criminal act of a third party."  Workman v.

United Methodist Comm. on Relief of the Gen. Bd. of Global Ministries of the United Methodist

Church, 320 F.3d 259, 262 (D.C. Cir. 2003) (citations omitted); see also Doe v. Dominion Bank

of Wash., 963 F.2d 1552, 1558 (D.C. Cir. 1992) (stating that "[a]s a general rule, a private person

19

does not have a duty to protect another from a criminal attack by a third person") (internal

quotation marks and citation omitted); Horridge v. St. Mary's County Dep't of Soc. Servs., 854

A.2d 1232, 1246 (Md. 2004) (holding that "a breach of duty by the defendant would result in his

liability in the third party criminal activity context only if the breach enhanced the likelihood of

the particular criminal activity which occurred") (internal quotation marks and citation omitted).

However, there is an exception to this "general rule of nonliability at common law" if there

exists, as there does here, "a [specific] relationship of control between the defendant and the

intervening criminal actor." Romero v. Nat'l Rifle Ass'n, 749 F.2d 77, 81 (D.C. Cir. 1984)

(using as an example a case "in which a hospital negligently caused the release of a potentially

violent patient") (citing Hicks v. United States, 511 F.2d 407 (D.C. Cir. 1975)); see also

Restatement (Second) of Torts § 315 (1965) (stating that "[t]here is no duty . . . to control the

conduct of a third person as to prevent him from causing physical harm to another unless . . . a

special relationship exists between the actor and the third person which imposes a duty upon the

actor to control the third person's conduct"); Lamb v. Hopkins, 492 A.2d 1297, 1302 (Md. 1985)

(adopting the "analytical framework" of Section 315).  In particular, it is well-settled that "[o]ne

who takes charge of a third person whom he knows or should know to be likely to cause bodily

harm to others if not controlled is under a duty to exercise reasonable care to control the third

person to prevent him from doing such harm."[15]  White v. United States, 780 F.2d 97, 103 (D.C.

---

[15] Because the Court concludes below that the plaintiff's wrongful death claim is appropriately governed by
Maryland substantive law, see Part IV, infra, it is important to note that Maryland courts have applied the tort
principles articulated in Section 319 of the Restatement (Second) of Torts in identical fashion to courts in the District
of Columbia.  See, e.g., Lamb, 492 A.2d at 1302 (stating that Maryland "expressly adopt[s] [Section] 319 as the law
. . . governing the duty of those in charge of persons having dangerous propensities").  Accordingly, although the
parties have briefed the questions of duty, foreseeability, and proximate causation that undergird the defendant's
motion for judgment on the pleadings or for summary judgment solely in terms of District of Columbia law, see

(continued...)

Cir. 1986) (quoting Restatement (Second) of Torts § 319 (1965)) (internal quotation marks omitted).  In <u>White</u>, the District of Columbia Circuit stated that its inquiry into whether a mental hospital owed a duty of care to protect the community from its dangerous patients was "made easy by well-established principles of tort law."  <u>Id.</u>  Adopting Section 319 of the Restatement (Second) of Torts, the <u>White</u> Court concluded that "as the custodial ward of criminally insane patients, [the hospital] assumes a duty to take . . . reasonable care to prevent harm to others."  <u>Id.</u> (footnote omitted).  The Court further observed that "[all] institutions, such as prisons and mental hospitals, that have custody over dangerous persons have a duty to members of the public to exercise reasonable care to control their inmates or patients."  <u>Id.</u>

---

[15](...continued)
Def.'s Mem. at 3; Pl.'s Opp. at 20 & n.21 (relying on District of Columbia caselaw and stating that "[b]ecause both [the District of Columbia and Maryland] apply the same Restatement of Torts standards to the questions raised by [the] [d]efendant's motion, [the] [p]laintiff does not separately address the issues under each state's substantive law"), the Court observes that Maryland law compels the same conclusions that it reaches herein.

In <u>Lamb v. Hopkins</u>, for example, the parents of a five-year-old girl severely injured in an automobile accident brought suit against the probation officers of the individual whose drunken driving had allegedly caused the accident, arguing that the officers had negligently failed to report the individual's numerous probation violations to the appropriate authorities.  <u>Lamb</u>, 492 A.2d at 1299.  The plaintiffs further contended that "had these officers reported [the individual's] misconduct to the courts[, he] would not have been in a position to commit the tortious acts because he would have been incarcerated."  <u>Id.</u> at 1302.  In affirming the lower court's decision to dismiss the plaintiffs' suit, the Maryland Court of Appeals held that the probation officers owed no duty of care to the plaintiffs because they "did not meet the threshold requirement of taking charge of the probationer within the meaning of § 319."  <u>Id.</u>  The <u>Lamb</u> Court went on to state that "an actor typically takes charge of a third person by placing him in some form of custody[,] . . . [such as] <u>a correctional institution incarcerating a dangerous criminal</u> or a mental institution confining a dangerous patient."  <u>Id.</u> (citations omitted) (emphasis added).  The Court then noted that "the probationer in [its] case . . . was not incarcerated in a correctional institution or confined in a mental hospital, <u>nor had he been negligently released from these facilities</u>, at the time of the . . . automobile accident."  <u>Id.</u> (emphasis added).  Thus, the <u>Lamb</u> Court, whose adoption of Section 319 remains an accurate statement of the landscape of Maryland tort principles, <u>see, e.g.</u>, <u>Remsburg v. Montgomery</u>, 831 A.2d 18, 31-32 (Md. 2002) (describing <u>Lamb</u>'s "delineat[ion] [of] the boundaries of § 319"), expressly contrasted the facts of the case before it with a circumstance in which a dangerous individual was alleged to have been negligently released from a correctional institution that had assumed custody over him, <u>Lamb</u>, 492 A.2d at 1302.  In light of this clear guidance, the Court concludes with no difficulty whatsoever that the duty owed by Hope Village—as well as concomitant questions of foreseeability and proximate causation as applied to the principles of Section 319—is identical whether analyzed under the law of Maryland or, as set forth below, the law of the District of Columbia.

Hope Village, which contracts with state and federal agenies to house and supervise convicted criminals, including violent felons, serving as the offenders' transition point between prison and full parole, is clearly one such institution.  SOW at 0.  Therefore, to the extent that the criminal offenders within its care are, by dint of their history of violent crime or other, similar indicia, foreseeably "likely to cause bodily harm to others if not controlled," Hope Village has an identical duty "to exercise reasonable care to control [its residents]."  White, 780 F.2d at 103 (quoting Restatement (Second) of Torts § 319) (internal quotation marks omitted).  And just as the Circuit concluded in White that St. Elizabeth's Hospital, "as part of [its] duty to protect the public, . . . was obligated to take steps to prevent the escape of its dangerous patients," id. (also stating that the plaintiff in that case "could properly seek recovery for a breach of this duty by [St. Elizabeth's]"), so too is Hope Village obligated to prevent the negligent release of its residents into the community at large and to otherwise "make reasonable efforts to prevent [its] ward[s] from causing physical harm to others," Johnson v. District of Columbia, Civ. No. 03-2548, 2006 WL 2521241, at *11 (D.D.C. Aug. 30, 2006).  In such situations, when an institution such as Hope Village has voluntarily assumed custody over dangerous individuals, "[u]nless persons injured by [that institution's] failure to properly perform its functions can recover for their injury, society's ability to insure that the [institution] conscientiously performs its duties is rendered haphazard at best."  White, 780 F.2d at 103 (internal quotation marks and citation omitted).

### 2. Was the Murder of the Plaintiff's Daughter Reasonably Foreseeable?

Here, the defendant does not specifically take exception with the plaintiff's position that Kelly is an individual who it "[knew] or should [have known] to be likely to cause bodily harm to others" as an abstract and general matter.  Id. (quoting Restatement (Second) of Torts § 319);

see Pl.'s Opp. at 28-32; see generally Def.'s Mem. (failing to address the issue of Kelly's

dangerousness); Def.'s Reply (same).  Rather, Hope Village argues that the specific harm done to

the plaintiff by Kelly—the murder of her nine-year-old daughter—"was a wholly unforeseeable

act for which [it] bears no responsibility."  Def.'s Mem. at 10; see also id. (asserting that the

plaintiff presents "no evidence . . . that [the] [d]efendant was on notice of a substantial risk of

harm to the [p]laintiff or her daughter").  In response, the plaintiff claims that, given Kelly's

history of violence and burglary, as well as his failure to adhere to the conditions of his release

while a resident at Hope Village, "a reasonable jury could find it reasonably foreseeable that [he]

would break into a home in the Washington metropolitan area carrying a loaded weapon—a

circumstance likely to lead to serious physical harm or death to anyone inside that residence"—if

released prematurely into the community.  Pl.'s Opp. at 29; see also id. at 28 (contending that

Hope Village "reasonably should have foreseen that members of the local community would be

harmed by inadequately supervised offenders, released with favorable recommendations to the

correspondingly liberal supervision of parole authorities").

    "It is axiomatic that under a negligence regime, one has a duty to guard against only

foreseeable risks."  Novak, 452 F.3d at 911-12 (internal quotation marks and citation omitted);

see also McKethean v. Wash. Metro. Area Transit Auth., 588 A.2d 708, 717 (D.C. 1991)

(holding that when a defendant is sued for the criminal act of a third party, "[t]he defendant will

be liable only if the criminal act is so foreseeable that a duty arises to guard against it"); but see

Smith v. District of Columbia, 413 F.3d 86, 103 (D.C. Cir. 2005) (stating that "[t]he defendant

may be held liable for harm that is foreseeably attributable to his conduct as well as for

unforeseeable harm attributable to his conduct, unless it appears that the chain of events is highly

extraordinary in retrospect") (internal quotation marks and citation omitted).  Where, as here, the

plaintiff alleges that the defendant's negligent acts or omissions resulted in an injury directly

attributable to "the acts of a 'third-party' criminal offender," Pl.'s Opp. at 19, the District of

Columbia Court of Appeals has held that "the requisite duty of care required for negligence is a

function of foreseeability, arising only when foreseeability is alleged commensurate with the

extraordinary nature of intervening criminal conduct."[16] Beretta, 872 A.2d at 641 (internal

quotation marks, citation, and footnotes omitted); see also Workman, 320 F.3d at 262 (stating

that "[i]n the District of Columbia, a defendant may be liable for harm caused by the criminal act

of another only if the crime was particularly foreseeable") (citation omitted).  Thus, under

District of Columbia law, whether the defendant is liable "when the [plaintiff's alleged] harm is

caused by the criminal act of a third party . . . depends on a heightened showing of

foreseeability." Novak, 452 F.3d at 912 (internal quotation marks and citation omitted)

(emphasis added); see also Beretta, 872 A.2d at 641 (stating that "[w]here an injury is caused by

the intervening criminal act of a third party, [the District of Columbia Court of Appeals] has

repeatedly held that liability depends upon a more heightened showing of foreseeability than

would be required if the act were merely negligent") (internal quotation marks and citation

omitted); id. at 642 (noting "the demanding nature of the requirement of precise proof of a

---

[16]  As the District of Columbia Circuit observes:

> Ordinarily, the relationship between the parties is the key to determining whether the defendant had
> a legally enforceable duty to the plaintiff (or her decedent), whereas foreseeability is important to
> issues of proximate causation and conformity to the standard of care, issues that arise only after a duty
> has been found. . . .  [However, in the District of Columbia,] the courts have in more recent cases
> tended to leapfrog directly to the foreseeability issue, with the parties' relationship, as noted above,
> a factor relevant to determining whether the requirement of foreseeability has been satisfied.

Workman, 320 F.3d at 265 (citations omitted); see also Beretta, 872 A.2d at 641 n.4 (confirming the accuracy of
Workman's characterization of District of Columbia law).

heightened showing of foreseeability in the context of an intervening criminal act involving the discharge of weapons") (internal quotation marks, citation, and emphasis omitted); <u>Shadday v. Omni Hotels Mgmt. Corp.</u>, 477 F.3d 511, 513 (7th Cir. 2007) (noting that District of Columbia law "requires a 'heightened showing of foreseeability' of plaintiffs who seek to impose liability on a third party who failed to prevent a criminal's attack") (citing cases).

Although this standard "is a demanding one, and the proof [offered] must be precise, . . . [t]he plaintiff is not . . . required to show previous occurrences of the particular type of harm [suffered by the plaintiff]." <u>Novak</u>, 452 F.3d at 912 (internal quotation marks and citations omitted). Rather, "the requirement [of a heightened showing of foreseeability] can be met instead by a combination of factors which give the defendant an increased awareness of the danger of a particular criminal act." <u>Id.</u> (internal quotation marks and citation omitted); <u>see also</u> <u>Dominion Bank</u>, 963 F.2d at 1561 (stating that "[an] insistence that [the plaintiff must] show the previous occurrence of a particular type of crime . . . [is] at odds with [the District of Columbia's] multi-factored, anti-talismanic approach to foreseeability"). Nevertheless, "the plaintiff bears the burden of establishing that the criminal act was so foreseeable that a duty arises to guard against it." <u>Beretta</u>, 872 A.2d at 641 (internal quotation marks, citation, and emphasis omitted); <u>see also</u> <u>Workman</u>, 320 F.3d at 265 (observing that "[District of Columbia] courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty") (citing cases). In addition, "[i]f the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important." <u>Novak</u>, 452 F.3d at 912 (internal quotation marks and citation omitted).

The Court has already concluded that Hope Village has a duty to take reasonable care to protect the community at large from bodily harm done by dangerous criminal offenders within its custody.  See White, 780 F.2d at 103.  It is also undisputed by Hope Village that "Kelly was a career criminal with a long history of burglary, theft, violent crimes (including possession and use of a loaded weapon), and escape from a halfway house."  Pl.'s Opp. at 31; see generally Def.'s Mem.; Def.'s Reply.  Thus, because Hope Village "[has taken] charge of a third person whom [it] knows or should know to be likely to cause bodily harm to others if not controlled[,] [it] is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm," Restatement (Second) of Torts § 319, and "specific evidence of foreseeability is less important" in this instance than it would be if Hope Village did not possess such a duty, Novak, 452 F.3d at 912 (internal quotation marks and citation omitted).

Hope Village's duty to protect the community from the criminal acts of Kelly stems from its willingness to assume control over him despite its knowledge, or constructive knowledge, of his "[d]angerous [p]ropensities."  Restatement (Second) of Torts § 319; see also Texas Home Mgmt. v. Peavy, 89 S.W.3d 30, 37 (Tex. 2002) (finding that because the plaintiff proffered "evidence that [an intermediate care facility] was aware of [its resident's] dangerous propensities[,] . . . [the facility] should have foreseen the danger inherent in [allowing the resident to visit his mother in another city, outside of the facility's control]").  Such a duty has therefore been established in a very broad sense with respect to Hope Village and the community at large, and the "relational component" ordinarily required in order to find the defendant potentially liable for a criminal act committed by Kelly or other violent residents of the facility has been satisfied.  Workman, 320 F.3d at 263 (citation omitted).  However, in light of the

"precise proof of a heightened showing of foreseeability" demanded in this jurisdiction when a

defendant is sought to be held liable for "an intervening criminal act involving the discharge of

weapons," Beretta 872 A.2d at 643 (internal quotation marks and citation omitted), it remains

incumbent upon the plaintiff to provide some "specific evidence of foreseeability" with regard to

the particular criminal act at issue in this case, Novak, 452 F.3d at 912 (internal quotation marks

and citation omitted).  The Court will therefore evaluate not only whether the relationship

between Hope Village and Kelly was such that Hope Village knew or should have known that he

was generally capable of violent behavior, but whether it was reasonably foreseeable that Hope

Village's allegedly negligent acts which facilitated the release of Kelly could lead ultimately to

the tragic murder of the plaintiff's daughter.  See Smith, 413 F.3d at 108 (Ginsburg, J.,

dissenting) (noting that "[w]hether a particular harm is foreseeable ordinarily turns upon the level

of generality at which the harm is defined"); Dominion Bank, 963 F.2d at 1563 (Williams, J.,

concurring) (stating that when determining foreseeability, "the level of generality at which the

risk is articulated will affect the probability" that it is deemed reasonably foreseeable).  Put

another way, the Court must not only conclude, as it has done, that Hope Village owes a duty of

care to the community at large, but that the plaintiff and her daughter, as residents of the

Washington metropolitan area, constituted part of that community such that a duty was owed to

them for protection against Kelly's foreseeable criminal acts.  See Peavy, 89 S.W.3d at 38

(holding that "[i]f the party in charge of the dangerous person knew or reasonably should have

known of the dangers that person posed, then persons foreseeably exposed to such danger may be

owed a duty of care") (citation omitted).

Here, the Court concludes that the plaintiff has demonstrated through "a combination of factors" that Hope Village was or should have been aware of the danger that Kelly would engage in criminal acts of violence—and, particularly, criminal acts of violence to which the plaintiff's daughter might foreseeably have fallen victim—upon his allegedly premature release from the halfway house.  Novak, 452 F.3d at 912 (internal quotation marks and citation omitted).  In determining whether the criminal acts of a third party are reasonably foreseeable by a defendant, "it is a matter of balancing the magnitude of the risk against the utility of the [defendant's] conduct," and factors to be considered include "the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, . . . the gravity of the harm that may result, . . . [and] the burden of the precautions which the [defendant] would be required to take."  District of Columbia v. Doe, 524 A.2d 30, 34 n.3 (D.C. 1997) (quoting Restatement (Second) of Torts § 302B cmt. f (1965)) (internal quotation marks omitted).  In this case, Kelly had a long criminal history, including multiple incidents of burglary and violent conduct, about which Hope Village was or should have been on notice.  See Presentence Report at 3-6 (detailing Kelly's criminal record); Britton Memo at 2-3 (same); Paparozzi Aff. ¶ 50; see also Doe, 524 A.2d at 34 (stating that "[e]vidence of prior incidents is generally admissible to show a defendant's notice or knowledge of a dangerous condition that causes an injury") (citations omitted).  The plaintiff offers undisputed expert testimony which shows that "[the] combination of property [crime] and violent crime" evident from Kelly's record made him "particularly dangerous because it renders it likely . . . that, given the opportunity, Kelly would commit crimes that would place him in direct contact with unsuspecting victims, often in their homes, producing crimes that cause serious injury or death."  Paparozzi Aff. ¶ 50.  It is also true, and wholly

undisputed by the defendant, that Kelly, by virtue of his status as a convicted violent felon,

coupled with his specific criminal history, would be highly likely to commit further criminal acts

if released from Hope Village before demonstrating that he had "acquire[d] the [necessary] tools

for self-improvement and law-abiding behavior."  SOW at 2; see Paparozzi Aff. ¶ 49 (assessing

Kelly's "criminal and social history, coupled with institutional assessments classifying him as

potentially impulsive and a pathological liar as well as an alcoholic," and "plac[ing] him in an

extremely high risk of recidivism category"); see also id. (comparing Kelly's risk profile "to ten

other randomly selected offenders with similar profiles" and finding "that all ten had gone on to

commit serious crimes").  Furthermore, as the plaintiff points out, "[t]he very reason [Hope

Village] was required to supervise and monitor Kelly and other inmates so closely was that

reasonable care was necessary to 'protect[] the public' from offenders who might commit harm

to others."  Pl.'s Opp. at 28 (quoting SOW at 40); see SOW at 0 (stating that the mission of

transitional facilities like Hope Village "is to protect society by confining offenders in . . .

controlled environments . . . that are safe, humane, cost-efficient, and appropriately secure").

The stringent institutional precautions supposed to have been in place at Hope Village were

mandated precisely for the purpose of guarding against the risk posed to members of the

community at large by Kelly and other violent criminal offenders during the transitional period

prior to their complete release into the community.  The defendant therefore cannot seriously

contend, in light of these precautions, that the prospect that violent inmates residing at Hope

Village might commit serious crimes if improperly controlled, left unsecured, or prematurely

released was "totally unforeseeable."  Def.'s Mem. at 9.  It is not reasonable to believe that an

entity such as Hope Village, which possesses a duty to protect the public from the violent

propensities of those individuals under its control who it "knows or should know to be likely to cause bodily harm to others if not controlled," White, 780 F.2d at 103 (quoting Restatement (Second) of Torts § 319 (1965)) (internal quotation marks omitted), should be taken completely by surprise if, through its alleged negligence, one of those individuals is prematurely released into the community and then commits exactly the sort of crime which the facility was tasked with preventing in the first place. See id. at 106 (finding that the patient in that case "had a long history of violent assaults and was committed to [the defendant hospital] to protect the public from the very type of behavior that led to [the plaintiff's] injuries"). Accordingly, the Court concludes that it was reasonably foreseeable that a convicted felon with Kelly's history of armed violence and burglary, who society deemed it necessary to be placed under the close care and supervision of a transitional, community-based facility for the protection of the public, might commit a violent crime in the course of illegally entering a stranger's home if negligently and prematurely released into the community. At the very least, "[e]ven under [the District of Columbia's] heightened showing of foreseeability, [the plaintiff's] evidence [has] created an issue on which reasonable people might differ, precluding the entry of judgment as a matter of law for the [defendant]." Dominion Bank, 963 F.2d at 1562 (internal quotation marks and citations omitted).

Hope Village argues that the Court's acceptance of the plaintiff's theory of liability would result in a "nearly universal duty of care on [the] [d]efendant's part for an indeterminate period of time." Def.'s Reply at 3; see also id. at 9 (contending that "[d]efendants in numerous similar custodial situations . . . would be deemed to owe a perpetual duty to the whole world"). The Court's conclusion, however, is not nearly so expansive, nor does it represent the sort of

uncharted foray into the extreme boundaries of tort liability that the defendants insinuate.  <u>See</u>

Def.'s Reply at 9.  Instead, the Court simply recognizes that there is no need to pinpoint with

precise accuracy which individuals are owed a duty by the defendant, so long as it can identify a

class of individuals who might foreseeably be injured as a result of the defendant's failure to

properly supervise or control its dangerous residents.  <u>Cf.</u> <u>Sterling v. Bloom</u>, 723 P.2d 755, 769

(Id. 1986) (observing that "[w]ith a drunk driver on the highways, it is strictly a matter of chance

who may become his victim . . . [but] potential victims [certainly] include those persons in the

class of motorists on the same highway").  "In order for [an] actor to be negligent with respect to

the [plaintiff], [its] conduct must create a recognizable risk of harm to the [plaintiff] individually,

or to a class of persons—as, for example, all persons within a given area of danger—of which the

[plaintiff] is a member."  <u>Dudley v. Offender Aid and Restoration of Richmond, Inc.</u>, 401 S.E.2d

878, 882-83 (Va. 1991) (quoting Restatement (Second) of Torts § 281 cmt. b (1964)) (internal

quotation marks omitted).  Thus, "one who takes charge of . . . a dangerous person incurs a . . .

duty to . . . [all] those who are directly and foreseeably exposed to the risk of bodily harm as a

result of the defendant's failure to control his dangerous charge."  <u>Id.</u> at 883.  The scope of this

"area of danger" can and will vary with the circumstance.  In this regard, the Supreme Court of

Virginia's formulation of the appropriate inquiry is aptly expressed:

> If a dangerous prisoner escapes custody, penniless and on foot, in a remote,
> unpopulated area, and is soon recaptured, the class of potential victims foreseeably
> at risk during the time of his escape may be very small indeed.  By contrast, if a
> dangerous prisoner is allowed, by a defendant's negligence, to run at large in a city
> throughout the nighttime hours, the class of potential victims at risk may extend to
> all who are present within the area to which the prisoner will foreseeably have access
> during his period of freedom.

<u>Id.</u>  The Ohio Supreme Court is in accord:

> Arguably, the [individual] who will kill wildly (rather than specifically identifiable victims) is the one <u>most</u> in need of confinement.  In negligent release cases, a defendant's duty generally has not been limited to readily identifiable victims, [because] . . . [c]itizens outside of the 'readily identifiable' sphere but still within the 'foreseeable zone of danger' are potential victims a [defendant] should consider if [it] has a duty to them and a means of adequately protecting them.

<u>Estates of Morgan v. Fairfield Family Counseling Ctr.</u>, 673 N.E.2d 1311, 1331 (Ohio 1997) (citation omitted); <u>see also</u> <u>Peavy</u>, 89 S.W.3d at 38 (stating that foreseeability must be analyzed "in terms of the known danger and the ability to control the third party's conduct") (citations omitted).  The Court entirely agrees with the approach articulated in these cases.

Here, the plaintiff's daughter was a resident of the District of Columbia metropolitan area.  Compl. ¶ 6.  Her father's house was located only a few miles from Hope Village, easily accessible to Kelly by personal use of car or public transportation.  <u>Id.</u> ¶ 14.  She was thus an indisputable part of the local community into which Kelly was released, members of whom Hope Village had a duty to protect from foreseeable harm by its residents.  Where a dangerous prisoner such as Kelly is released into the community, "the class of potential victims at risk may extend to all who are present within the area to which the prisoner will foreseeably have access during the period of his freedom."  <u>Dudley</u>, 401 S.E.2d at 883.  It is patently clear to the Court, for the reasons stated above, that this description encompasses the plaintiff's daughter.  In any event, whether the plaintiff's daughter falls within the class of people who were foreseeably at risk of being harmed by Kelly is, at the very least, a disputed issue of material fact not appropriate for summary judgment.  <u>See</u> <u>District of Columbia v. Carlson</u>, 793 A.2d 1285, 1291 (D.C. 2002) (stating that "foreseeability . . . is nearly always a question of fact for the jury") (internal quotation marks and citation omitted); <u>see also</u> <u>Doe</u>, 524 A.2d at 34 (concluding that "the

probative evidence presented by [the plaintiffs] of a criminally active environment raised a

factual issue of foreseeability . . . sufficient for submission to the jury") (footnote omitted);

Torres v. Dep't of Correction, 912 A.2d 1132, 1146 (Conn. Super. Ct. 2006) (finding that

"[b]ecause genuine issues of material fact exist as to whether the harm suffered was foreseeable

and whether the plaintiff and her decedent were foreseeable victims, summary judgment in

inappropriate on the issue of whether a duty exists in the present case").

Thus, in concluding that Hope Village owes a duty to the community at large to take

reasonable care to prevent the dangerous felons under its control from causing foreseeable bodily

harm to others, see Restatement (Second) of Torts § 319, including "tak[ing] steps to prevent the

escape [or negligent release] of its dangerous [residents]," White, 780 F.2d at 103, the Court is in

no way countenancing "limitless notions of duty and foreseeability," Beretta, 872 A.2d at 643

(citation omitted).  Rather, "[w]hether a duty exists is ultimately about fairness," District of

Columbia v. Doe, 524 A.2d 30, 33 (D.C. 1987) (internal quotation marks, citation, and emphasis

omitted), and both fairness and public policy considerations demand that Hope Village owe a

duty of care to individuals such as the plaintiff's daughter who fall within the class of people who

might foreseeably be harmed by dangerous offenders within the facility's custody and control.

See Thomas v. City Lights School, Inc., 124 F. Supp. 2d 707, 709 (D.D.C. 2000) (stating that

determining "whether a duty exists . . . involves a weighing of the relationship of the parties, the

nature of the risk, and the public interest in the proposed solution") (quoting Knippen v. Ford

Motor Co., 546 F.2d 993, 1000 (D.C. Cir. 1976)) (internal quotation marks and other citations

omitted); cf. Peavy, 89 S.W.3d at 39 (noting that "there is . . . an important interest in protecting

the public from dangerous individuals who are already subject to the state's supervision and

control").  Ruling otherwise would render Hope Village utterly immune from liability for the sort of negligence alleged in this case.[17]  See White, 780 F.2d at 103.

District of Columbia precedent supports this conclusion.  Broadly, courts applying District of Columbia law have refused to hold a defendant liable for the criminal acts of a third party only when it is clear that "there are no factors which created a situation where the intervening criminal act should have been reasonably anticipated and protected against." Clement v. People's Drug Store, Inc., 634 A.2d 425, 429 (D.C. 1993) (finding that drug store owed no duty of care to employee murdered while leaving the store at closing time) (internal quotation marks and citation omitted); see, e.g., Workman, 320 F.3d at 264-65 (finding that relief organization did not owe duty of care to worker murdered in Somalia); Romero, 749 F.2d at 81-82 (finding that organization owed no duty of care to individual murdered by a firearm stolen from the organization's premises because "the chain of events leading to the injury appear[ed] highly extraordinary in retrospect") (internal quotation marks and citation omitted); Beretta, 872 A.2d at 643 (finding that gun manufacturer did not owe duty of care relating to injuries suffered as the result of its allegedly negligent distribution of firearms); Potts v. District of Columbia, 697 A.2d 1249, 1252-53 (D.C. 1997) (finding that defendants owed no duty of care to patrons injured by gunshots after exiting boxing match); Bailey v. District of Columbia, 668 A.2d 817, 820 (D.C. 1995) (finding that high school owed no duty of care to individual injured by gunshots after

---

[17]  Nor can Hope Village assert a persuasive contrary interest.  Indeed, "[i]t is difficult to imagine that an organization[] such as [Hope Village] would be discouraged from [providing transitional services to criminal offenders] simply because the law expects that this function will be discharged without negligence."  Shively v. Ken Crest Ctrs. for Exceptional Persons, Civ. No. 96C-05-316, 2001 WL 209910, at *7 (Del. Super. Ct. Jan. 26, 2001).

exiting cheerleading competition); McKethean, 588 A.2d at 712 (finding transit authority owed no duty of care to pedestrians injured by automobile accident while waiting at bus stop).

In Potts, for instance, the plaintiffs sustained gunshot wounds as they were leaving a boxing event at the Washington Convention Center and sued the event organizer and the District of Columbia, among other entities, for negligence. Potts, 697 A.2d at 1250-51. In affirming the Superior Court's grant of summary judgment for the defendants, the District of Columbia Court of Appeals concluded that the evidence adduced by the plaintiffs to demonstrate the defendants' awareness of the likelihood of this sort of injury did not meet the "heightened showing of foreseeability in the context of an intervening criminal act involving the discharge of weapons," id. at 1252 (internal quotation marks and citation omitted), largely because "[the] plaintiffs [had] proffered no evidence of any prior gun-related violence at any other event held at the [Convention Center] or promoted by [the event organizer], nor any other specific evidence bearing directly on the foreseeability of the shooting incident at issue," id. Similarly, in Workman, "the mother of a woman murdered in Somalia while on a mission for the United Methodist Committee on Relief (UMCOR)" filed a lawsuit against UMCOR under the District of Columbia's wrongful death and survival statutes, alleging that it had "negligently failed to prepare her daughter for and protect her from the dangers of her assignment." Workman, 329 F.3d at 260. The District of Columbia Circuit concluded that "the evidence regarding the relationship between the parties [did] not suggest that UMCOR should be held responsible for [the murdered woman's] safety." Id. at 264. The Court stated that "[b]ecause UMCOR was in no better position to provide for [the woman's] safety than was [the woman] herself, the relationship between the parties is unlike those in which the courts have found a duty of

protection." Id. (citation omitted).  The Circuit Court also found that the plaintiff proffered nothing but "generic information" to suggest that UMCOR might reasonably have been able to foresee the particular harm that befell the plaintiff's daughter.  Id. (internal quotation marks and citations omitted).  Consequently, the Workman Court held that the plaintiff had "failed to adduce sufficient evidence to create a genuine issue of heightened foreseeability" and affirmed the district court's grant of summary judgment to UMCOR.  Id. at 265.

Unlike in Potts, the plaintiff here has demonstrated that Kelly had a history of engaging in gun-related violence and burglaries, about which Hope Village was, or should have been, aware when it assumed the responsibility of supervising him following his release from prison.  See Presentence Report at 3-6 (detailing Kelly's criminal record); Britton Memo at 2-3 (same); Paparozzi Aff. ¶ 50.  More to the point, in stark contrast to nearly all of the cases cited above and relied upon by the defendant, there exists in this case "a [specific] relationship of control between the defendant and the intervening criminal actor," Romero, 749 F.2d at 81, giving rise to a duty of care and a commensurately less burdensome requirement that the plaintiff demonstrate "specific evidence of foreseeability," Novak, 452 F.3d at 912 (internal quotation marks and citation omitted).[18]  In addition, the chain of events leading to the death of the plaintiff's daughter in this case can in no way be described as "highly extraordinary in retrospect."[19]  Romero, 749

---

[18]  The one exception is Johnson v. District of Columbia, Civ. No. 03-2548, 2006 WL 2521241 (D.D.C. Aug. 30, 2006), where another member of this Court held that a residential facility for troubled youths was not responsible for a murder committed by one of its former residents, who had absconded two months earlier.  The Johnson Court determined, inter alia, that that the residential facility did not know, and should not reasonably have known, that the escaped individual "had dangerous propensities." Johnson, 2006 WL 2521241, at *12.  As this Court explains, it is clear from the factual record here that Hope Village knew or should have known of Kelly's prior record of violent acts and burglaries.  Thus, the conclusion in Johnson is wholly inapposite.

[19]  The extent to which the plaintiff's injury was proximately caused by the defendant's allegedly negligent conduct, while unavoidably a component of a foreseeability inquiry, is examined in greater detail below.  See

(continued...)

F.2d at 80 (internal quotation marks and citation omitted).  To the contrary, that a violent offender like Kelly with a long history of perpetrating burglaries might, upon his allegedly premature release into the community, break into a stranger's house and commit a violent crime is, if anything, depressingly predictable.

As the Workman Court observed, courts in this jurisdiction have imposed a duty of care for third-party criminal conduct where "a good deal of evidence suggested [that] the defendant was on notice [that] there was a substantial risk of harm to the plaintiff" and where "the relationship between the plaintiff and the defendant suggested the defendant should be held liable as a matter of policy."  Workman, 320 F.3d at 263 (discussing cases).  By virtue of Hope Village's assumption of control over Kelly, its corresponding duty to take reasonable care to protect the community from his criminal acts, and the causal chain that leads directly from Kelly's allegedly premature release from Hope Village to the murder of the plaintiff's daughter, the factors discussed in Workman are all present here.  Id. at 263-64.  Indeed, the facts adduced by the plaintiff are strongly consonant with those cases, from the District of Columbia as well as other jurisdictions, in which courts have concluded that the criminal act of a third party was sufficiently foreseeable by the defendant that it "should have been reasonably anticipated and protected against."  Clement, 634 A.2d at 428.  In District of Columbia v. Doe, for example, the

---

[19](...continued)

Romero, 749 F.2d at 80 n.4 (noting that "it makes no difference whether [the defendant's liability is discussed] in terms of duty of care or proximate causation, since the fundamental analysis appears to remain constant whether we speak of an attenuated chain of cause and effect or the actor's obligation toward the party he may injure") (internal quotation marks and citation omitted); see also Workman, 320 F.3d at 265 (discussing blurring of foreseeability, duty, and proximate causation under District of Columbia law); Beretta, 872 A.2d at 641 n.4 (same); cf. Henley v. Prince George's County, 503 A.2d 1333, 1341 (Md. 1986) (observing that "[f]oreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct," while "[f]oreseeability as an element of proximate cause permits a retrospective consideration of the total facts of the occurrence, including the criminal acts of a third person occurring after the original negligence of the tortfeasor").

District of Columbia Court of Appeals concluded that a school owed its students a specific duty of care, by virtue of the foreseeability of the risk at issue, to protect them "from assaultive criminal conduct by intruders" where it was on notice regarding the danger of "crimes against persons in and around the school[,] . . . sexual assaults and other violent activity in the surrounding area[,] and deficient school security." Doe, 524 A.2d at 33-34. Similarly, in Doe v. Dominion Bank of Washington, the District of Columbia Circuit held that the landlord of a downtown office building owed a duty of care to a woman raped on the premises by an intruder, because the risk of such an attack was sufficiently foreseeable where "the [landlord] had incessant notice of criminal activity . . . ongoing at [the office building] during the two and a half years preceding [the woman's] rape." Dominion Bank, 963 F.2d at 1561; see also Novak, 452 F.3d at 911-14 (finding that dance club operators had a duty of care to protect patrons who were attacked in alley immediately after leaving the club); Torres, 912 A.2d at 1142-46 (finding that Connecticut Department of Correction owed duty of care when it allegedly negligently supervised prison inmate who escaped and murdered plaintiff's daughter); Peavy, 89 S.W.3d at 32 (finding that "an intermediate care facility for the mentally retarded owe[d] a duty of care to a person murdered by a resident of the facility" while the resident was on family leave in another city); Dudley, 401 S.E.2d at 883 (finding that halfway house owed duty of care to individual raped and murdered by felon residing in the facility). The Court therefore concludes that "the [plaintiff's] factual allegations are more than sufficient to support [not only] the inference that [Hope Village] knew, or should have known, that [Kelly] was likely to cause bodily harm to others unless [properly] controlled," but also the likelihood that the specific harm done by Kelly

if <u>not</u> properly controlled could foreseeably include the injury suffered by the plaintiff.[20]  <u>Dudley</u>, 401 S.E.2d at 882 (internal quotation marks omitted).

Finally, "well-established principles of tort law" regarding the apportionment of liability compel the Court's conclusion.  <u>White</u>, 780 F.2d at 103.  There can be little doubt that Hope Village had knowledge of the risk of potential harm and the ability to prevent the events that led ultimately to the tragic death of the plaintiff's nine-year-old daughter.  "The practical question . . . is whether the defendant knows or should know that the risk is great enough, in relation to the cost of averting it, to warrant the defendant's incurring the cost."  <u>Shadday</u>, 477 F.3d at 513 (applying District of Columbia law); <u>see also</u> <u>Beretta</u>, 872 A.2d at 644 (requiring "precise proof of knowledge [that an injury was foreseeable] and [a] corresponding ability to prevent [this injury]" to find a defendant negligently liable for the criminal acts of a third party).  As mentioned already, in <u>Doe v. Dominion Bank of Washington</u>, a woman raped on the vacant floor of an office building sued the building's landlord for negligently failing to keep the area safe. <u>Dominion Bank</u>, 963 F.2d at 1554-58.  As the Circuit Court observed in a later case, "the relationship between the plaintiff and the defendant [in <u>Dominion Bank</u>] suggested the defendant should be held liable . . . because the landlord was in the better position both to know about security threats and to protect against them." <u>Novak</u>, 452 F.3d at 913 (discussing <u>Dominion Bank</u>) (internal quotation marks and citation omitted).  Similarly, not only is Hope Village in a better position to assess the risk posed by violent offenders like Kelly than are any other

---

[20] Indeed, as the Court noted above, although the defendant disputes whether the murder of the plaintiff's daughter was a reasonably foreseeable result of its alleged negligence, it does not challenge the plaintiff's contention that it knew or should have known that Kelly was a dangerous individual with a history of violence who posed a generalized threat to the community at large.  <u>See</u> <u>generally</u> Def.'s Mem.; Def.'s Reply.

members of the community into which such offenders are released, but it is also "[better]

equipped to guard against [that risk] . . . [and far more able] to take the necessary protective

measures." Kline v. 1500 Massachusetts Avenue Apartment Corp., 439 F.2d 477, 484 (D.C. Cir.

1970). Indeed, it is expressly tasked with this responsibility. See SOW at 0 (stating that the

mission of facilities such as Hope Village "is to protect society by confining offenders in [a]

controlled environment[] . . . that [is] safe, humane, . . . and appropriately secure, [and to]

provide work and other self-improvement opportunities to assist offenders in becoming law-

abiding citizens").

### 3. Was Hope Village's Duty Extinguished?

The defendant argues alternatively that even if it did owe a legal duty of care to protect

the community from Kelly while he was a resident of the facility, such a duty was extinguished

either by Kelly's release from Hope Village on March 7, 2002, or by the CSOSA's subsequent

assumption of supervisory responsibilities. Def.'s Mem. at 7-8. Hope Village thus contends that

it "cannot be held responsible for the death of [the] [p]laintiff's daughter because [it] had no

control over Anthony Kelly during the . . . five months between his discharge and the [August 6,

2002 murder of Erika Smith]." Id. at 8. The Court disagrees that Hope Village's duty of care

was extinguished by Kelly's release from the facility or by any events that occurred thereafter.

First, it is simply illogical to conclude that Hope Village's allegedly negligent

contribution to the premature release of Kelly into the community would extinguish its duty to

protect that same community from reasonably foreseeable harm incurred as a result of the

premature release itself. See Pl.'s Opp. at 42-43 (arguing that "[s]uch a result would create

perverse incentives of disastrous proportions[,] as institutions would be encouraged to simply

expedite the release of dangerous offenders at the first hint that the offender might commit a dangerous act in the community"). As the Ohio Supreme Court has observed, "[i]t is clearly unsound to absolve a negligent defendant because of the very act which made his conduct negligent." Estates of Morgan, 673 N.E.2d at 1332; see also Peavy, 89 S.W.3d at 34 (observing that "[t]he fact that [an intermediate care facility] no longer had custody or control of [a resident] at the time of the murder does not address whether [the facility] negligently failed to exercise control over [the resident] prior to his release"). Therefore, Hope Village's duty was not extinguished by Kelly's release, even if that release relieved Hope Village of having direct custody and control over him, as long as the harm asserted by the plaintiff was foreseeable at the time of Hope Village's purported negligence, as the Court concludes a jury could reasonably find in this instance.

Moreover, the fact that Kelly was transferred into the control and supervision of the CSOSA following his release from Hope Village similarly did not extinguish Hope Village's duty of care. See Def.'s Mem. at 8. This is not to say that there are not circumstances the Court can imagine where the assumption of control over a paroled inmate by another organization after his release into the community would abrogate the duty owed by the halfway house to the community at large. For example, suppose that an inmate is prematurely released due to the negligent acts of one halfway house, re-arrested following his release, and prematurely released again due to the negligent acts of a second halfway house, after which he commits a murder. Even if the murder was committed within the time during which the inmate would have remained incarcerated if not for his release from the first halfway house, it is difficult to envision that that halfway house's duty of care to protect the community against harm done by the individuals over

41

whom it assumes control would survive the offender's re-entry into the criminal justice system and his subsequent release from the second halfway house, which in the interim had assumed full supervision and custody over him.  Here, however, the level of supervisory control assumed over Kelly by the CSOSA, and, specifically, by Kelly's Community Supervision Officer ("CSO"), was not nearly so complete that it extinguished Hope Village's duty of care.[21]  See Fox v. Custis, 372 S.E.2d 373, 376 (Va. 1988) (noting that "parolees ordinarily are essentially free to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer [rather than being subjected to] continuing hourly or daily dominance and dominion"); Lamb v. Hopkins, 492 A.2d 1297, 1302-05 (Md. 1985) (finding that probation officer did not "take charge" of probationer sufficient to give rise to a duty of care under Restatement (Second) of Torts § 319).  Hope Village, "under its contract with [the BOP], undertook a responsibility for very close and continuous supervision of its inmates," a responsibility which "differ[s] substantially, both in degree and in kind, from the duties imposed upon [the CSOSA]."[22]  Dudley,

---

[21]  In so concluding, the Court does not in any way suggest that CSOs (as parole officers are now called in the District of Columbia) have no duty of care over the parolees they are tasked with supervising, but only that such a duty, to the extent it exists, does not suffice to shield a halfway house, which exerts far more direct and custodial control over offenders in their care, from liability for criminal acts resulting from its allegedly negligent conduct.  See Rieser v. District of Columbia, 563 F.2d 462, 478-79 (D.C. Cir. 1977) (finding that parole officer owed duty of care for his failure to notify a parolee's employer about the parolee's criminal record and to properly supervise his parole); cf. Martinez v. California, 444 U.S. 277, 285 (1980) (declining to "decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole," but holding that "at least under the particular circumstances of [the] parole decision [at issue], [the] decedent's death is too remote a consequence of the parole officer's action to hold them responsible") (footnote omitted).

[22]  In addition, the plaintiff alleges that the CSOSA "received, and relied upon, incorrect and incomplete information provided by [Hope Village] regarding the activities, behavior, violations, and risk assessment of Anthony Kelly while he was at Hope Village, which directly impacted any subsequent supervision . . . after Kelly was discharged from [Hope Village]," Pl.'s Stmt. at 4, and that "the impact of [Hope Village's] misconduct [therefore] continued after Kelly's technical discharge on March 7, 2002, into the parole period and through the date of Erika Smith's murder," id. at 3; see also Pl.'s Opp. at 38-39 (contending that Hope Village "should have foreseen that its failure to report Kelly's violations [of the terms of his confinement] would create an environment where Kelly was significantly more likely to commit harm, despite the supervision of the parole authorities") (footnote omitted).

(continued...)

401 S.E.2d at 881.  Accordingly, the Court concludes that Hope Village's duty to "make reasonable efforts to prevent [Kelly] from causing physical harm to others," Johnson, 2006 WL 2521241, at *11, did not end simply because another entity assumed some level of supervisory control over Kelly after his allegedly negligent and premature discharge from the facility.[23] Instead, to the extent that Hope Village's purported negligence while Kelly was under its control was a proximate cause of the plaintiff's asserted injury—a question to which the Court now turns—its duty persisted until, and encompassed, the tragic act committed by Kelly on August 6, 2002, even after he was no longer under the defendant's direct supervision, custody, and control.

---

[22](...continued)
The defendant does not attempt to rebut this argument, relying instead on its rigid delineation of the period of time in which Hope Village had direct supervisory control over Kelly.  See Def.'s Reply at 4 (stating that "[the] [p]laintiff fails . . . to recognize that Anthony Kelly was not in [the] [d]efendant's 'control' and had not been under its supervision for nearly five (5) months . . . prior to the death of [the] [p]laintiff's daughter").  Drawing "all justifiable inferences" in the plaintiff's favor and accepting her evidence as true, Anderson, 477 U.S. at 255, the Court agrees that, at the very least, it is a question for the jury whether Hope Village should have foreseen that its failure to report Kelly's violations to the BOP and the favorable report and recommendation that it provided to the CSOSA upon Kelly's release would negatively impact the ability of the CSOSA "to detect Kelly's [subsequent] violations and reincarcerate him" or to "supervise[] Kelly as it would an individual who was likely to commit additional serious crime," Pl.'s Stmt. at 4.

[23]  The defendant relies on Johnson, an unpublished 2006 decision by another member of this Court, to support its claim that "any duty on [its] part ended once Anthony Kelly was discharged and placed under the supervision of [the CSOSA]."  Def.'s Reply at 4 (citing Johnson).  In Johnson, the mother of a teenager who was shot and killed on a street corner filed suit against the residential facility for troubled youths from which the individual responsible for the killing had escaped two months earlier.  Johnson, 2006 WL 2521241, at *1.  The plaintiff alleged that the facility "knew that the [perpetrator] had absconded on two prior occasions and negligently failed to supervise him accordingly.  Id.  The District Court concluded that any duty the facility might have had to control the individual "cannot have survived [his] escape [from the facility], especially given the length of time that elapsed between his abscondence and [the] murder."  Id. at *11; see also id. at *12 (finding that the individual "was far beyond [the defendant's] custodial control at the time he [committed the murder]").  For the reasons already given, however, to the extent the result in Johnson would suggest that Hope Village's duty to protect the community from foreseeably violent acts of Kelly and its other residents was categorically extinguished by Kelly's premature release, by the CSOSA's subsequent assumption of supervision, or at some other point in the intervening months between that release and the murder of the plaintiff's daughter, this Court takes exception with the reasoning of that case.  See Pl.'s Opp. at 31 n.32 (discussing Johnson).

**B. Proximate Causation**

The District of Columbia Court of Appeals "has defined proximate causation as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." District of Columbia v. Zukerberg, 880 A.2d 276, 281 (D.C. 2005) (internal quotation marks and citation omitted). "[U]nder [the] proximate cause analysis, an actor whose conduct is a substantial factor in bringing about harm shall be liable in negligence . . . for[, inter alia,] harm foreseeably attributable to his or her conduct." White, 780 F.2d at 106 (internal quotation marks, ellipses, and footnote omitted). "An intervening negligent or criminal act breaks the chain of causation if it is not reasonably foreseeable. . . . [and] there is no proximate causation when the sequence of events leading to an injury is highly extraordinary in retrospect." McKethean, 588 A.2d at 716 (internal quotation marks and citations omitted). Proximate cause may be demonstrated by "either direct or circumstantial evidence." Zukerberg, 880 A.2d at 281 (citation omitted).

Here, the defendant contends that the chain of events leading from its alleged negligence to the murder of the plaintiff's daughter were "highly extraordinary," and that the chain of proximate causation was therefore broken, because (1) the plaintiff's injury was too remote in time and space from Hope Village's challenged conduct, Def.'s Mem. at 12; and (2) both the CSOSA's allegedly negligent supervision of Kelly following his release from Hope Village and Kelly's criminal actions themselves constitute superseding causes of the plaintiff's injury which break the causal chain and insulate the defendant from any liability, id. at 9-12; Def.'s Reply at

10-11.[24]  In response, the plaintiff simply states that "[t]he question is not how long Kelly was free before he murdered Erika Smith, but whether, but-for [Hope Village's] misconduct, Kelly would have been incarcerated on the day he murdered Erika Smith."  Pl.'s Opp. at 42 (emphases omitted); see also Pl.'s Stmt. at 5 (contending that "[i]f not for [Hope Village's] negligent and reckless acts and omissions, Anthony Kelly would have been incarcerated on August 6, 2002, and unable to commit Erika Smith's murder").  Pl.'s Stmt. at 5.  The plaintiff further claims that "[h]ad Hope Village performed its duties with reasonable care, Kelly would have been returned to prison and would have remained incarcerated at least long enough to eliminate the possibility that he could have murdered Erika Smith on August 6, 2002, irrespective of any subsequent supervision by the government."  Pl.'s Opp. at 40 (citations omitted).  For the reasons below, the Court finds that the plaintiff's claim that the defendant's conduct was the proximate cause of the death of her daughter is not necessarily precluded by the five-month interval between the alleged negligence and the injury or by the existence of intervening intentional or negligent acts by third parties.  Accordingly, the Court concludes that "the proximate cause of [the plaintiff's] injury is [appropriately] a question for the jury."  Smith, 413 F.3d at 102; see also Sofec, 517 U.S. at 840-41 (holding that "[t]he issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder") (citation omitted).

---

[24]  Reflecting the blurring of foreseeability, duty, and proximate causation under District of Columbia law, see Romero, 749 F.2d at 80 n.4, the defendant's arguments regarding the proximate cause of the plaintiff's injury are intertwined, and in many respects interchangeable, with its positions on heightened foreseeability and the extinguishing of its duty, see Def.'s Mem. at 8-10; Def.'s Reply at 9-10.  Because the Court has already concluded that the plaintiff's injury was a reasonably foreseeable result of the defendant's conduct and that the defendant's duty of care did not end when it relinquished direct control over Kelly, see supra, its examination of proximate causation addresses only the defendant's contentions regarding the asserted remoteness of the plaintiff's injury and whether or not the conduct of Kelly or the CSOSA constitute superseding causal factors.

*1. Remoteness*

The defendant contends that "[t]he five month time period that Anthony Kelly was supervised by other entities demonstrates that [the] [p]laintiff's claims against [it] are too remote." Def.'s Mem. at 12 (citation omitted). However, while "[r]emoteness in time or space may give rise to the likelihood that other intervening causes have taken over the responsibility," such remoteness does not conclusively bar liability "when causation is found[] and other factors are eliminated." W. Prosser & W. Keeton, Torts § 43, p. 283 (5th ed. 1984); see also 1 D. Dobbs, Law of Torts § 180, p. 445 (2001) (stating that "a defendant's conduct is not too remote for liability merely because time or distance separates the defendant's act from the plaintiff's harm"). "[W]here it is evident that the influence of the actor's negligence is still a substantial factor, mere lapse of time, no matter how long, is not sufficient to prevent it from being the legal cause of the other's harm." Hicks, 511 F.2d at 420 (internal quotation marks and citation omitted) (emphasis added); see also id. at 421 (finding that "the negligence of [the defendant hospital] was a substantial factor which contributed to the release of [its patient], as part of the continuing course of events which link the negligence of the [h]ospital to the death of [the murder victim] as a proximate cause of it"). Rather, "[i]n determining proximate cause, the point beyond which the law declines to trace a series of events that exists along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice." Torres, 912 A.2d at 1148 (internal quotation marks and citation omitted); see also Morgan, 673 N.E.2d at 1332 (stating that "no fixed rule can be established as to how quickly the harm must occur in order to hold the defendant liable"). And while there do exist "various liability-limiting considerations which relieve the defendant of liability for harm he actually caused where the chain of events

appears highly extraordinary in retrospect," Beretta, 872 A.2d at 643 (internal quotation marks, citation, and footnote omitted), this is not an instance where such considerations are appropriate, nor is Hope Village being held liable for "the unforeseeable criminal actions of third parties," id. at 643 n.7.  Instead, the chain of events leading from Hope Village's allegedly negligent supervision of Kelly to his premature release and finally to the tragic death of the plaintiff's daughter is not in the least extraordinary, and the plaintiff has provided more than enough evidence at this stage in the proceedings to survive summary judgment and to be given the opportunity "[to] show that [the] defendant['s alleged actions and omissions] were a direct link in [this] causal chain."  Id. at 644 (internal quotation marks and citation omitted).

By the same token, however, the Court is unwilling to subscribe wholesale to the plaintiff's particular, conclusory formulation of "but-for" causation.  The plaintiff argues that the very fact that Kelly would otherwise have been incarcerated on the day of the murder if not for Hope Village's allegedly negligent acts and omissions provides the necessary element of proximate causation to satisfy any questions of remoteness.  See, e.g., Pl.'s Opp. at 42 (stating that "[t]he question is not how long Kelly was free before he murdered Erika Smith, but whether, but-for [Hope Village's] misconduct, Kelly would have been incarcerated on the day he murdered Erika Smith") (emphases omitted).  Yet it is entirely too simplistic to say that a halfway house or similar institution can be held liable in these circumstances merely because the inmate would have been incarcerated and unable to commit the criminal offense giving rise to the plaintiff's injury were it not for the institution's negligent conduct.  Such a formula is too constraining, and the balancing that must be employed to determine issues of reasonable foreseeability and continuity of the causal chain requires a more nuanced analysis than that.  See

Torres, 912 A.2d at 1148 (proximate causation is ultimately "a matter of fair judgment and a rough sense of justice") (internal quotation marks and citation omitted). Two examples are illustrative. First, suppose that a violent offender is sentenced in January 2000 to a thirty-five year term, but is negligently released in January 2005 after serving only five years of his prison sentence. The offender is a model citizen for almost thirty years, but then commits a murder in December 2034, one month before the expiration of his original term of incarceration. Absent tremendously compelling factual circumstances, it is difficult to imagine how the prison authorities responsible for the offender's premature release—whose involvement with him, and assumption of control and custody over him, has long since faded into the past—could be held liable for the crime even if the offender would otherwise have been in prison when the offense was committed. Second, suppose that two violent offenders are sentenced to terms of detention which expire on June 1st. Both are negligently released from a halfway house on May 1st, one month early. As a result of their newfound freedom, both offenders revert to their criminal ways: one commits a murder on May 31st, and the other commits an identical murder on June 2nd. All else being equal, the plaintiff's theory calls for a perverse result: the halfway house being held liable for the first murder, which was committed when that offender would otherwise have been incarcerated, but not the second murder, committed by the other offender only two days later. Accordingly, instead of basing its determination of proximate cause solely, or even substantially, on this sort of 'but-for' formulation, the Court finds that the determinative factor should be whether "it is evident that the influence of the actor's negligence is still a substantial factor" leading to the plaintiff's harm, regardless how long or short the lapse in time between the breach

and the injury.[25]  Hicks, 511 F.2d at 420 (internal quotation marks and citation omitted).  In any event, the Court need not define the outer boundaries of proximate causation, because it is clear that the facts presented in this case fall comfortably enough within them as to leave the question appropriately to the jury.

### 2. Superseding Causes

"Where two tortfeasors are involved, the <u>unforeseeable</u> action of the subsequent tortfeasor may be a superseding cause which breaks the chain of causation."  Grant v. District of Columbia, 597 A.2d 366, 369 (D.C. 1991) (internal quotation marks and citation omitted) (emphasis added); see also 65 C.J.S. Negligence § 206 (2007) (stating that "[i]n order for an intervening act to break the chain of causation between the original act of negligence and [the asserted] injury, the intervening act must be unrelated to the original act").  "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which [its] antecedent negligence is a substantial factor in bringing about."  Sanders, 642 A.2d at 849 (internal quotation marks and citation omitted).  Again, foreseeability plays a part in the Court's inquiry.  See McKethean, 588 A.2d at 716 (stating that "[a]n intervening negligent or criminal act breaks the chain of causation if it is not reasonably foreseeable") (internal quotation marks and citation omitted); see also 65 C.J.S. Negligence § 206 (stating that "[t]o relieve [a defendant] from liability for negligent conduct, an intervening act or force <u>must not have been a normal consequence of [its] acts</u> or have been reasonably foreseeable") (emphasis added) (footnote omitted).  As discussed above, Kelly's criminal acts

---

[25]  The lapse in time, of course, may suggest that the actor's negligence is <u>not</u> "still a substantial factor" in the cause of the injury, Hicks, 511 F.2d at 420 (internal quotation marks and citation omitted), but temporal remoteness is not itself the silver bullet for making such a determination.

which gave rise to the plaintiff's claim were a foreseeable consequence of, and were proximately

caused by, the defendant's allegedly negligent conduct.  Furthermore, the Court concludes below

that the CSOSA's supervision of Kelly after his release from Hope Village did not "break[] the

chain of causation" leading from the defendant's alleged negligence in failing properly to

supervise and control Kelly or to report his conduct to the BOP, to Kelly's subsequent premature

release, and ultimately to the murder of the plaintiff's daughter.  Grant, 597 A.2d at 369.

Therefore, and for the following reasons, neither the murder itself nor any alleged negligence by

the CSOSA after Kelly's release constitute superseding factors which relieve Hope Village from

liability in this matter.

The defendant first argues that Kelly's criminal actions were an intervening factor which

render it no longer liable for its allegedly negligent conduct.  Def.'s Mem. at 10-11.  "[A]

defendant is responsible despite intervening criminal acts if the acts are those 'the defendant

might reasonably anticipate, and against which the defendant would be required to take

precautions.'"  White, 780 F.2d at 107 n.33 (internal quotation marks and citation omitted).  The

White Court further stated:

> [W]here criminal acts operate on a background created by [the] defendant, the real
> issue is whether the defendant should be responsible for the intervening criminal acts.
> Thus, if the likelihood of [an individual's] criminal conduct is a hazard that the
> [defendant] is obligated to protect against, that criminal conduct does not become a
> superseding cause that exonerates the [defendant].

Id. at 107 (internal quotation marks, emphasis, and footnotes omitted); see also Doe, 524 A.2d at

33 n.2 (stating that "[i]f the likelihood that a person may act in a particular manner is the hazard .

. . which makes the actor negligent, such an act, whether innocent, negligent, intentionally

tortious, or criminal does not prevent the actor from being liable for harm caused thereby")

(internal quotation marks and citation omitted).  The Court has already concluded that (1) Hope Village owed a general duty of care to protect the community at large from harms committed by Kelly and other violent offenders over whom it voluntarily assumes custody; (2) Kelly's criminal conduct was reasonably foreseeable by Hope Village, given his history of burglary and violent behavior; (3) Hope Village's duty of care was not extinguished by its allegedly negligent acts leading to the release of Kelly into the community; and (4) it is possible to trace a discrete chain of causation leading from Kelly's release from Hope Village to his murder of the plaintiff's daughter.  Therefore, because the likelihood that Kelly might pose a risk to the community "is the hazard which makes [Hope Village] [allegedly] negligent," his criminal conduct does not, and cannot, insulate the defendant from liability in this case.  Doe, 524 A.2d at 33 n.2 (internal quotation marks and citation omitted).

The defendant next asserts that the negligence of the CSOSA in failing to properly supervise Kelly following his release constitutes a superseding legal cause of the murder of the plaintiff's daughter which relieves the defendant of any liability.  Def.'s Mem. at 11-12; Def.'s Reply at 10-11.  "An intervening cause will be considered a superseding legal cause that exonerates the original actor if it was so unforeseeable that the actor's negligent conduct, though still a substantial causative factor, should not result in the actor's liability."  Butts v. United States, 822 A.2d 407, 418 (D.C. 2003) (citation omitted) (emphasis added); see also Sanders, 642 A.2d at 849 (stating that "[a] third party's negligence is a superseding cause of harm where the original actor should not have anticipated that act") (internal quotation marks and citations omitted); cf. Hicks, 511 F.2d at 420 (stating that "[t]he rule is settled by innumerable authorities that if injury be caused by the concurring negligence of the defendant and a third person, the

defendant is liable to the same extent as though it had been caused by his negligence alone")
(internal quotation marks and citation omitted).  Although District of Columbia courts have not
established a concrete framework to determine whether, and under what conditions, a subsequent
actor's intervening negligence should act as a superseding cause and relieve the allegedly
negligent defendant of responsibility for the harm asserted, the Restatement (Second) of Torts
provides that "[t]he intervention of a force which is a normal consequence of a situation created
by the actor's negligent conduct is not a superseding cause of harm which such conduct has been
a substantial factor in bringing about."  Restatement (Second) of Torts § 443 (1965) (emphasis
added); see also 65 C.J.S. Negligence § 206 (stating that "the intervening cause must be
disconnected from the negligence of the first person and must be of itself an efficient,
independent, and self-producing cause of the injury") (footnote omitted).[26]  Accordingly, even
assuming that the CSOSA was negligent in its supervision of Kelly after his release from Hope
Village, this negligence is immaterial unless the defendant can show that the post-release
negligence somehow diverted Kelly onto the path that led him to kill the plaintiff's daughter,
rather than simply allowing the wheels that were already set in motion by the negligence of Hope
Village to continue to spin.  The defendant does not allege, and cannot demonstrate, that the
negligence of the CSOSA is the true and only cause of the plaintiff's injury.  See generally Def.'s

---

[26]  In addition, the Restatement provides that the negligent conduct of a third party cannot be considered a superseding cause of harm if

(a) the [original] actor at the time of [its] negligent conduct should have realized that a third person might so act, or
(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Restatement (Second) of Torts § 447 (1965).

Mem. at 11-12; Def.'s Reply at 10-11.  Nor can the Court say that Hope Village "should not have anticipated" that the CSOSA, acting on Hope Village's representations that Kelly had fulfilled his conditions of community-based confinement and was ready to be placed back into the community, would negligently fail to supervise Kelly following his parole, allowing him to commit crimes that, with sufficient oversight, would have resulted in Kelly's reincarceration before the murder of the plaintiff's daughter.  Sanders, 642 A.2d at 849 (internal quotation marks and citation omitted).  Finally, the Court has already determined that it was reasonably foreseeable, considering Kelly's criminal record and the safeguards that were supposed to be in place to protect the community from violent offenders residing at Hope Village, "that, given the opportunity, Kelly would commit crimes that would place him in direct contact with unsuspecting victims, [quite possibly] in their homes, producing crimes that cause serious injury or death."  Paparozzi Aff. ¶ 50.  Therefore, because the CSOSA's alleged negligence did not independently produce an unforeseeable result, it cannot itself be considered "so unforeseeable that the [defendant's] negligent conduct, though still a substantial causative factor [in the death of the plaintiff's daughter], should not result in the [defendant's] liability."  Butts, 822 A.2d at 418 (citation omitted).  Accordingly, the Court concludes that even if the CSOSA was also negligent for failing to properly supervise Kelly upon his release from Hope Village, and even if that negligence was one link in the causal chain leading to the death of the plaintiff's daughter, the CSOSA's actions or omissions do not constitute a superseding cause sufficient to negate or deflect Hope Village's potential liability.

### IV. The Plaintiff's Motion to Alter or Amend Judgment

In dismissing the plaintiff's wrongful death claim on July 26, 2006, the Court concluded that the one-year statute of limitations contained in § 16-2702 of the District of Columbia's wrongful death statute, D.C. Code Ann. § 16-2701 et seq. (2007), "applies regardless of whether the District of Columbia's or other jurisdiction's substantive law governs the plaintiff's wrongful death action."  Order at 3.  The plaintiff correctly notes, however, that unlike ordinary limitations provisions, which are procedural in nature, "'the time limit for filing a wrongful death suit is substantive[,]' . . . and courts in the District of Columbia must apply the limitations provision of the [state whose] law . . . governs the [wrongful death] claim."  Pl.'s Mot. at 1 (quoting Huang v. D'Albora, 644 A.2d 1, 3 (D.C. 1994)); see also Lewis v. Reconstruction Fin. Corp., 177 F.2d 654, 655 (D.C. Cir. 1949) (discussing the choice of law exception applicable to "rights of action of a purely statutory nature, such as . . . wrongful death statutes").  Applying choice of law principles, the Court must therefore determine whether the plaintiff's wrongful death claim is appropriately governed by the substantive law of the District of Columbia, the one-year limitations period of which would bar the plaintiff's claim, D.C. Code Ann. § 16-2702, or the substantive law of Maryland, which has a three-year limitations period for wrongful death actions under which the plaintiff's claim would have been timely filed, Md. Code Ann., Cts. & Jud. Proc. § 3-904(g)(1) (2007).  For the reasons that follow, the Court concludes that the District of Columbia wrongful death statute, as well as the applicable caselaw, compel application of the Maryland statute of limitations to the plaintiff's wrongful death claim.  Accordingly, the Court will grant the plaintiff's motion to alter or amend its earlier judgment dismissing the plaintiff's wrongful death claim.

The District of Columbia Circuit plainly stated in <u>Lewis</u> that in a wrongful death action, "the limitation [period] laid down by the law of the state where the fatal injuries occurred should govern, unless the public policy of the forum is clearly opposed."[27] <u>Lewis</u>, 177 F.2d at 656.  In this case, the fatal injury that forms the gravamen of the plaintiff's wrongful death action—the murder of the plaintiff's daughter—indisputably occurred in Silver Spring, Maryland.  Compl. ¶ 14; Pl.'s Mot. at 6; Def.'s Opp. at 6.  Thus, under <u>Lewis</u>, the substantive law of Maryland should govern, as long as the District of Columbia's public policy is not "clearly opposed."  <u>Lewis</u>, 177 F.2d at 656.  It is not.  Indeed, in this instance, the interests of the District are substantially <u>advanced</u> by the application of Maryland law to the plaintiff's claim.  The District of Columbia wrongful death statute applies only to actions in which, "by an injury happening or done <u>within the limits of the District</u>, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation."  D.C. Code Ann. § 16-2701(a) (emphasis added); <u>see</u> <u>also</u> <u>Lewis</u>, 177 F.2d at 656 (stating that "[the District of Columbia's] wrongful death statute, and the limitations thereof[,] are confined to deaths resulting from injuries suffered within the District of Columbia") (citations omitted).  Although the wrongful action alleged here—that is, Hope Village's negligent failure to properly supervise and control Kelly and to report his conduct to the BOP—took place "within the limits of the District," D.C. Code Ann. § 16-2701(a), the injury asserted by the plaintiff occurred, as noted, in Maryland, Compl. ¶ 23 (referencing "the negligent act or omission of [the] [d]efendant and the sudden, unexpected, and extremely violent death of her only child caused by [the] [d]efendant's negligent act or omission").  Therefore, by its own

---

[27] Although <u>Lewis</u> was decided nearly sixty years ago, it remains good law and is therefore binding on this Court.

terms, the District of Columbia wrongful death statute would not apply to the plaintiff's wrongful

death claim. See Lewis, 177 F.2d at 656 (stating that "[t]he narrow scope of the [District of

Columbia's wrongful death statute] precludes its application in any part to a case where the fatal

injuries occurred outside the District"); Jones v. Prince George's County, 202 F.R.D. 39, 40-41

(D.D.C. 2001) (stating that the District of Columbia wrongful death statute could not be applied

where the defendant police officers "were conducting police activities in the District of

Columbia" which led to a shooting death in Virginia). And because the District of Columbia has

a strong interest in regulating the conduct of entities like Hope Village that house, and ultimately

recommend the release of, dangerous persons like Kelly within its borders, it has no interest in

the application of its law in such a way as to frustrate this aim and to effectively shield the

alleged tortfeasor from liability. See White, 780 F.2d at 103 (noting society's interest in ensuring

that institutions that voluntarily take custody of dangerous individuals "conscientiously perform[]

[their] duties"). The statement in Lewis that "the limitation [period] laid down by the law of the

state where the fatal injuries occurred should govern, unless the public policy of the forum is

clearly opposed," therefore compels the application of Maryland's substantive law to the

plaintiff's wrongful death claim.[28] Lewis, 177 F.2d at 656. In Maryland, as in the District of

---

[28] The defendant contends that "District of Columbia courts follow 'the substantial interest' test or analysis when faced with choice of law or conflict issues." Def.'s Opp. at 6. While true, the Court concludes that application of the Lewis test is appropriate in this instance because it is tailored specifically for choice of law questions involving wrongful death statutes, while the substantial interest test is not. Even under the alternative framework invoked by the defendant, however, it is clear that the Court should apply the substantive law of Maryland to the plaintiff's wrongful death claim. Under District of Columbia law, "[t]o decide which jurisdiction's law applies in tort cases[,] . . . [the Court must] balance the competing interests of the two jurisdictions[] and apply the law of the jurisdiction with the more substantial interest in the resolution of the issue." Jaffe v. Pallotta TeamsWorks, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (internal quotation marks and citation omitted). That is, "[u]nder a choice of law analysis, [District of Columbia courts] appl[y] another state's law when (1) [that state's] interest in the litigation is substantial, and (2) application of District of Columbia law would frustrate the clearly articulated public policy of that state." Herbert v. District of Columbia, 808 A.2d 776, 779 (D.C. 2002) (internal quotation marks and citation

(continued...)

Columbia, "the limitations period in [its] wrongful death statute 'is part of the substantive right of action.'"[29] Huang, 644 A.2d at 4 (quoting Slate v. Zitomer, 341 A.2d 789, 794 (Md. 1975)). Accordingly, Maryland's three-year limitations period for wrongful death actions should govern, and the Court concludes that the plaintif's March 2005 claim concerning the August 2002 death of her daughter was therefore timely filed.[30]

---

[28](...continued)
omitted).  Furthermore, "when the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails."  Id. (internal quotation marks and citation omitted).  As noted above, the District of Columbia has a strong interest in facilitating a wrongful death action against a District of Columbia corporation alleged to have negligently released a dangerous felon into the District of Columbia metropolitan area.  To the extent that this action could be brought under Maryland law rather than District of Columbia law, the District of Columbia's interest lies in the application of the substantive law of Maryland.  Applying the substantial interest test to the present circumstances thus reveals that (1) Maryland has no clear interest in the application of either jurisdiction's substantive law to a wrongful death action brought in a District of Columbia court; and (2) the District of Columbia has a clear interest in applying Maryland substantive law.  Once again, this is in harmony with the admonition of the White Court:  Public policy demands, where possible, that "persons injured by [an entity's] failure to properly perform its functions [—by failing to properly control and supervise the dangerous individuals over whom it has voluntarily assumed custody—should be able to] recover for their injury," or else "society's ability to [e]nsure that the [entity] conscientiously performs its duties is rendered haphazard at best."  White, 780 F.2d at 103 (footnote omitted).

[29] The Maryland wrongful death statute contains a choice of law provision which states that "[i]f the wrongful act occurred in another state, the District of Columbia, or a territory of the United States, a Maryland court shall apply the substantive law of that jurisdiction."  Md. Code Ann., Cts. & Jud. Proc. § 3-903(a) (2007) (emphasis added).  By its plain terms, however, this provision governs only the application of choice of law principles in Maryland courts.  Md. Code Ann., Cts. & Jud. Proc. § 3-903(a).  It is thus silent about actions brought in courts in other jurisdictions, and their application of Maryland law, where the wrongful act occurred in a jurisdiction other than Maryland.  See Pl.'s Mot. at 4 n.3.  A broader interpretation of this provision—specifically, one which would bind the courts of other jurisdictions, as well as Maryland courts, to apply the choice of law principles set forth therein—would result in neither Maryland nor the District of Columbia, by the terms of their wrongful death statutes, permitting an application of their substantive law to an action in which the complained-of conduct occurred in the District and the death itself occurred in Maryland.  Cf. Huang, 644 A.2d at 3-4 (declining to address plaintiff's argument that the Maryland wrongful death statute "specifically directs application of the District of Columbia's substantive law when . . . the wrongful act occurred in the District," even in District of Columbia courts) (footnote omitted).  Such an infinite loop is plainly not contemplated by either jurisdiction.

[30] The defendant argues that because the plaintiff previously represented to the Court, in the parties' October 2005 Joint Statement of the Case, that she was bringing her wrongful death claim under District of Columbia law, see Order at 2 n.3, she should now be estopped from claiming that Maryland substantive law properly applies.  Def.'s Opp. at 3, 9-10.  The Court disagrees.  The doctrine of "judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  Pegram v. Herdich, 530 U.S. 211, 228 n.8 (2000).  Here, however, the plaintiff has not yet prevailed in any phase of this case based on her prior representation that she was proceeding under District of Columbia law as

(continued...)

## V.  Conclusion

"Whether a duty exists [under tort law] is ultimately a question of fairness."  <u>Doe</u>, 524

A.2d at 33 (internal quotation marks, citations and emphasis omitted).  Furthermore, "[i]n

determining proximate cause, the point beyond which the law declines to trace a series of events

that exists along a chain signifying actual causation is a matter of fair judgment and a rough

sense of justice."  <u>Torres</u>, 912 A.2d at 1148 (internal quotation marks and citation omitted).

Here, the Court concludes that it is, and must be, fair to hold a halfway house that voluntarily

assumes custody over dangerous criminals liable for the harm those criminals are able to inflict

upon third parties as the result of the halfway house's alleged negligence, so long as that harm is

reasonably foreseeable.  In so concluding, the Court does not "relax [the] basic liability-limiting

standards of duty, foreseeability, and causal remoteness" that are given justly great weight in this

jurisdiction as in others.  <u>Beretta</u>, 872 A.2d at 645 (internal quotation marks and citation

omitted).  Simply put, "institutions, such as prisons and mental hospitals, that have custody over

---

[30](...continued)
to her wrongful death claim, even assuming that that representation was not, as the plaintiff claims, simply a mistake.  <u>See</u> Pl.'s Opp. at 2 n.1; <u>see</u> also <u>Prince Constr. Co. v. District of Columbia Contract Appeals Bd.</u>, 892 A.2d 380, 386 n.7 (D.C. 2006) (stating that "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity") (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750-51 (2000)) (internal quotation marks omitted).  Accordingly, it cannot be said that the defendant has been prejudiced by its reliance on the plaintiff's October 2005 representation.  <u>See Prince Constr. Co.</u>, 892 A.2d at 386 n.7 (stating that one consideration in determining whether judicial estoppel applies "is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped") (internal quotation marks and citation omitted).  Although the defendant claims that "[d]uring discovery, [the] [p]laintiff repeatedly utilized arguments that could only be made under District of Columbia law in order to gain an advantage over and prejudice [the] [d]efendant," Def.'s Opp. at 10, the sole example the defendant marshals in this regard concerns its motions for a protective order and to quash subpoenas, which the Court has already denied without prejudice as moot, <u>see</u> supra n.1.  Given the well-settled "jurisprudential  preference . . . for adjudication on the merits rather than on the basis of formalities," <u>Ciralsky v. CIA</u>, 355 F.3d 661, 674 (D.C. Cir. 2004) (internal quotation marks and citation omitted), the defendant's position is a very thin gruel upon which to base a finding of estoppel at this stage of the proceedings.  It need hardly be said, however, that having "prevail[ed] in [this] phase of [the] case" by conclusively asserting that she is bringing her wrongful death claim under Maryland law, the plaintiff is estopped from taking any contradictory position in the future.  <u>Pegram</u>, 530 U.S. at 228 n.8.

dangerous persons have a duty to members of the public to exercise reasonable care to control their inmates or patients." White, 780 F.2d at 103; see also Peavy, 89 S.W.3d at 39 (holding that "[i]t is not unreasonable to expect a facility that takes charge of persons likely to harm others to exercise reasonable care in its operation to avoid foreseeable attacks by its charges upon third persons") (internal quotation marks and citations omitted).  So too is the case for halfway houses that voluntarily assume the responsibility of housing and supervising violent criminal offenders. Otherwise, as the District of Columbia Circuit has stated, "[u]nless persons injured by [such institutions'] failure to properly perform [their] functions can recover for their injury, society's ability to [e]nsure that the [institutions] conscientiously perform[] [their] duties is rendered haphazard at best."  White, 780 F.2d at 103 (internal quotation marks and citation omitted).  The defendant's motion for judgment on the pleadings or, in the alternative, for summary judgment must therefore be denied.  In addition, the Court finds that the District of Columbia's wrongful death statute compels application of Maryland's statute of limitations to the plaintiff's wrongful death claim.  For this reason, the plaintiff's wrongful death claim was filed timely, and the Court grants her motion to alter or amend its prior judgment dismissing that claim.

      **SO ORDERED** this 12th day of April, 2007.[31]

REGGIE B. WALTON
United States District Judge

---

[31] An Order consistent with the Court's ruling was issued on March 29, 2007.